<pre>
 1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
 2                     AT TACOMA

 3

 4  UNITED STATES OF AMERICA,    )  Docket No. CR16-5110RJB
                                 )
 5          Plaintiff,           )  Tacoma, Washington
                                 )
 6  vs.                          )  October 31, 2016
                                 )
 7  DAVID TIPPENS,               )
                                 )
 8          Defendant.           )
    ─────────────────────────────)
 9
    UNITED STATES OF AMERICA,    )  Docket No. CR15-387RJB
10                               )
            Plaintiff,           )
11                               )
    vs.                          )
12                               )
    GERALD LESAN,                )
13                               )
            Defendant.           )
14  ─────────────────────────────)

15  UNITED STATES OF AMERICA,    )  Docket No. CR15-274RJB
                                 )
16          Plaintiff,           )
                                 )
17  vs.                          )
                                 )
18  BRUCE LORENTE,               )
                                 )
19          Defendant.           )
    ─────────────────────────────)
20
            TRANSCRIPT OF EVIDENTIARY HEARING
21        BEFORE THE HONORABLE ROBERT J. BRYAN
         SENIOR UNITED STATES DISTRICT COURT JUDGE
22
    Court Reporter:        Teri Hendrix
23                         Union Station Courthouse, Rm 3130
                           1717 Pacific Avenue
24                         Tacoma, Washington  98402
                           (253) 882-3831
25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.
</pre>

1
2                              APPEARANCES:

3   For the Plaintiff:       MATTHEW HAMPTON
                             Assistant United States Attorney
                             700 Stewart Street, Suite 5220
4                            Seattle, Washington 98101-1271

5                            KEITH BECKER
                             U.S. Department of Justice
6                            1400 New York Avenue NW, 6th Floor
                             Washington, DC 20530
7
    For Defendant Tippens:   COLIN FIEMAN
8                            Office of the Public Defender
                             1331 Broadway, Suite 400
9                            Tacoma, Washington 98402

10  For Defendant Lesan:     ROBERT W. GOLDSMITH
                             Law Office of Robert W. Goldsmith
11                           702 2nd Avenue
                             Seattle, Washington 98104
12
    For Defendant Lorente:   MOHAMMAD ALI HAMOUDI
13                           Office of the Public Defender
                             1601 5th Avenue, Suite 700
14                           Seattle, Washington 98101

15

16

17

18

19

20

21

22

23

24

25

1                 **T A B L E   O F   C O N T E N T S**

2
                          October 31, 2016
3

TESTIMONY                                            PAGE
4

5    BRIAN LEVINE
        Direct Examination By Mr. Becker.............. 13
6        Cross-Examination By Mr. Fieman............... 43
         Redirect Examination By Mr. Becker............ 88
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Monday, October 31, 2016 - 9:30 a.m.

2      (Defendants present.)

3              THE CLERK:  All rise.  The United States District

4   Court is now in session, the Honorable Robert J. Bryan

5   presiding.

6              THE COURT:  Please be seated.  Good morning.  Okay.

7   This is the time set for hearing motions in three combined

8   cause numbers:  United States versus David Tippens, Gerald

9   Lesan and Bruce Lorente.  Those are Cause Nos. 16-5110,

10   15-0387 and 15-0274.

11      I understand the defendants are all present, counsel?

12              MR. FIEMAN:  Yes, Your Honor.

13              THE COURT:  Their lawyers, Mr. Fieman, Mr. Goldsmith

14   and Mr. Hamoudi, are present for the defendants.

15      For the government are Mr. Hampton and Mr. Becker.

16              MR. HAMPTON:  Good morning, Your Honor.

17              THE COURT:  There are a couple of preliminary

18   matters.  First, I wanted to find out the status of the

19   Michaud case at this point.

20              MR. HAMPTON:  Your Honor, the government has filed a

21   motion to extend the briefing schedule.  I don't believe that

22   the Ninth Circuit has acted on that as yet.  I haven't seen an

23   ECF.  Mr. Fieman, is that correct?

24              MR. FIEMAN:  That's correct, Your Honor.  That second

25   request for an extension was over my objection, and we are

1  waiting to hear from the Ninth Circuit whether they will grant

2  a new scheduling order.

3              THE COURT:  Okay.  In regard to Michaud, I don't know

4  who I told, whether I told counsel or whether it was in my

5  chambers, but it seems to me that Michaud is basically a dead

6  issue.  As long as the notice of appeal is pending, I don't

7  have jurisdiction to do anything, and the information on the

8  motions that are now before the Court on these cases are

9  somewhat different, with different information, different

10  affidavits and different briefing, as well as all the briefing

11  that's been filed by various judges around the country on the

12  same issues.

13      So it appears to me that my role is to start all over in

14  this and take it as it comes.  That's not to say that I don't

15  have recall of what happened there, and the record of what

16  happened there is the record.

17      I don't know how you propose to proceed today.  There is

18  the proposed motion -- or the motion for a pretrial

19  conference.  I delayed signing that because I anticipated that

20  there might be a response, and there was.  I have read those

21  documents.  I have not signed the order setting that up for

22  the simple reason that I am not sure that it was necessary at

23  this point in this case because, of course, I don't know what

24  the government may want to show at such a hearing.

25      But it also crossed my mind that if it was the same

1  information that was presented in Michaud, there's no reason

2  to present it again, but if there's something new that's

3  critical to the motions here, then we can proceed with that.

4         MR. BECKER:  Thank you, Your Honor.  Your Honor, it

5  is not the same information as was presented in Michaud.

6  There are some critical new pieces of information,

7  particularly the pieces of information that have triggered the

8  filings coming under the Classified Information Procedures

9  Act, and so we would maintain that the Court would -- we'd

10  still maintain our request that the Court review this new

11  material.

12         THE COURT:  There are three motions pending here.

13  Does that hearing have to do with one or more of those

14  motions?

15         MR. BECKER:  It pertains to the motion to exclude

16  evidence because it relates to information that has not been

17  produced to the defense that they have requested in discovery.

18         THE COURT:  And at what point should we do that?

19         MR. BECKER:  Your Honor, we can be prepared to

20  present those materials today during a break.  We'd need some

21  lead time because they have to be couriered down here from the

22  FBI, but we can make them available for Court review today.

23  And then if the Court were to grant our motion to appoint a

24  classified information security officer, that individual would

25  then be responsible to contact you to provide the documents

 1  whenever you needed to review them again and ensuring their
 2  security.
 3      That person hasn't been appointed yet, and so today we are
 4  prepared to show Your Honor the documents.  We'd have to take
 5  them back.
 6          THE COURT:  When is Barry available?
 7          THE CLERK:  He's not available 1:30 to 2:30, but he's
 8  available the rest of the day.
 9          THE COURT:  Could we set that for like 2:30?
10          MR. BECKER:  Yes, we can do that.
11          THE COURT:  Does that make sense?
12          MR. FIEMAN:  Your Honor, if I may be heard briefly on
13  that.  To request clarification, my understanding from the
14  government's pleadings is that there would be three areas that
15  are potentially, or are in fact classified.  One relates to
16  the security risks that would arise from disclosure of the NIT
17  code.  I believe from my pleadings that that aspect of what's
18  being submitted to the Court would be the same as in Michaud
19  and if it's not, I would appreciate knowing that on the
20  record.
21      The other two aspects -- and again, it's just my
22  understanding -- relate to the VEP review and witness
23  identities, and those areas would be new.  Those issues were
24  not addressed in Michaud, so if we could just clarify whether
25  the NIT code presentation that is going to be presented,

1  apparently ex parte, is the same, that would be helpful.

2          THE COURT:  Okay.

3          MR. BECKER:  Your Honor, I am somewhat limited in

4  what I can state in open court given the sort of issue that we

5  are discussing.  Again, as I said, there's been a change in

6  status regarding information which led the government to make

7  a CIPA filing, which we did not do in Michaud.  So I think

8  that's the easiest way for me to answer that question.

9          THE COURT:  I have signed the order, and we'll plan

10  on that at 2:30.

11          MR. FIEMAN:  Thank you, Your Honor.  I don't think I

12  need to note my objections in the pleadings; is that correct?

13          THE COURT:  I have your pleadings on that, that I

14  have read.

15          MR. BECKER:  Judge, there's one issue that I wanted

16  to raise with respect to the defense pleadings regarding the

17  Classified Information Procedures Act.  In the defense

18  pleading, they suggested that the government was invoking the

19  state secrets privilege and that that would require a

20  certification by a head of agency.

21      We are not invoking the state secrets privilege.  That

22  would relate to civil issues rather than criminal issues.  We

23  are operating pursuant to the Classified Information

24  Procedures Act, and we are prepared to present additional

25  briefing on that discreet issue which we think would be

1   important, if necessary.

2       So if the Court were going to determine that there would

3   be some requirement of a head of agency to certify

4   classification of data, we would ask to be able to present

5   briefing on that issue.

6           THE COURT:  Okay.  Here's the order on that, and

7   we'll plan on that at 2:30.  That will give me an opportunity

8   to reread the briefing you filed on it and the act itself,

9   which I know has been in some dispute at times.

10      Now, we have three motions pending from all three

11  defendants.  The first, in order of filing, is docket 31 which

12  was a Motion to Exclude Evidence.  The second motion is docket

13  32, and that's a Motion to Dismiss Indictment.  The third

14  motion in order of filing was the Motion to Suppress Evidence

15  in docket 35.

16      I have read all your pleadings at least once and mostly

17  twice, and I don't know how you wish to proceed on these

18  motions, in what order you want to take them or how you want

19  to proceed on them.

20          MR. FIEMAN:  As I understand today, the government

21  has one witness, Your Honor.  Professor Levine is here, I

22  guess to either explain or supplement his declaration.  We are

23  not planning at this point to call any witnesses, potentially

24  one rebuttal witness.  That, of course, would all relate to

25  the motion to exclude.

1      The defense believes that all of the facts and evidence

2   that the Court needs to decide the motion to suppress and also

3   the *Franks* motion folded in there, as well as the motion to

4   exclude, is already all before the Court in terms of the

5   exhibits and declarations that have been submitted.

6      So that would leave just one witness, is my understanding,

7   from the government on the motion to exclude and discovery

8   issues.

9          THE COURT:  Are you all suggesting we take the motion

10  to exclude first?

11         MR. FIEMAN:  Your Honor, what I would anticipate as

12  maybe being workable is for them to offer their witness, take

13  the testimony on that and then, subject to your review of the

14  classified records, we would then be prepared to argue all of

15  the issues in one argument together.

16         THE COURT:  Mr. Becker, Mr. Hampton?

17         MR. BECKER:  Your Honor, we think that's workable.

18         THE COURT:  Okay.

19         MR. GOLDSMITH:  Could I just add one thing, just for

20  the record?  On behalf of all three defendants, any time Mr.

21  Fieman speaks, we are joining into all of his objections and

22  arguments, just so that the record is clear, Your Honor.

23         THE COURT:  I understand.

24         MR. HAMOUDI:  Thank you, Your Honor.

25         THE COURT:  Now, on this motion to exclude, my law

1   clerk pointed out to me that he wasn't sure here in the record

2   that in these cases a specific discovery request has been

3   made, that the government has not responded to, that responds

4   to this motion.

5        MR. FIEMAN:  If I may clarify, Your Honor.  Certainly

6   what we noted in our initial motion to exclude pleading was

7   that we had made a request to the government for disclosure of

8   all the NIT components, most clearly laid out in Vlad

9   Tsyrklevich's declaration which was submitted as an exhibit to

10  our motion to exclude docket 31 and --

11       THE COURT:  You think that preliminary matter is part

12  of the record?

13       MR. FIEMAN:  Yes, Your Honor.  And my understanding

14  is that the government has declined, as in Michaud, to provide

15  that discovery, with one development noted in our pleading

16  from last Wednesday.  Apparently, we will be getting some or

17  all codes related to the identifiers now.

18       MR. HAMPTON:  Your Honor, as to the unique

19  identifiers code, we have provided that, so that has been

20  provided.  We have also provided, as we have, and are willing

21  to make available the pay load component.  I think that's

22  understood, but just to make sure we are clear on that as

23  well.

24       MR. FIEMAN:  Well, if I can make sure the record is

25  clear.  The payload component that was provided is the one

1   that is referenced in Mr. Tsyrklevich's declaration.  We have

2   not received any additional code.

3       Our understanding -- again based on that declaration and

4   some other information that we will develop through Professor

5   Levine -- that was a partial payload or partial code, so we

6   are contending there's still a complete payload that's

7   missing, but they did provide some payload code just --

8   nothing has been provided since the Michaud ruling except the

9   identifier issue.

10          THE COURT:  Now, does either side wish to make any

11  opening comments before we hear testimony?

12          MR. HAMPTON:  Your Honor, I apologize.  I want to

13  confirm one thing.  We do disagree with that assessment.  I

14  realize that's a matter for the Court, and we will resolve

15  that, but we believe we have provided or are willing to make

16  available the full payload.

17      I neglected to mention that we also made available the

18  network packet traces for each of the three defendants'

19  interactions with the FBI.  So the defense has thus far

20  declined to examine those, but they are available, and I just

21  want that on the record.

22          THE COURT:  Do you wish to make any other comments

23  before we start?

24          MR. FIEMAN:  No, thank you, Your Honor.  I think that

25  clarifies the record where we disagree about it.

1          THE COURT:  All right.  You may call your witness.

2          MR. BECKER:  At this time, the government calls Brian

3   Levine.

4          THE COURT:  If you'll raise your right hand and be

5   sworn.

6        BRIAN LEVINE, called as a witness, duly sworn.

7          THE COURT:  Please be seated.  Let me ask you to

8   speak right into the mike and keep your voice up, please.

9          MR. BECKER:  Your Honor, if I can just have a brief

10  moment to set the computer up.  Could I ask the Court staff,

11  we are not publishing the computer now.

12          THE CLERK:  You wanted it unpublished?

13          MR. BECKER:  Yes.  Thank you.

14          THE COURT:  Okay.

15          BY MR. BECKER:  May I inquire, Your Honor?

16                       DIRECT EXAMINATION

17  BY MR. BECKER:

18  Q.  Sir, can you start by stating and spelling your full name

19  for the record?

20  A.  My name is Brian Levine, B-r-i-a-n  L-e-v-i-n-e.

21  Q.  What do you do for a living?

22  A.  I am currently a professor in the College of Information

23  and Computer Sciences at the University of Massachusetts,

24  Amherst.  I joined the faculty in 1999 as an assistant

25  professor.  I was granted tenure in 2005.  I was promoted to

1   professor -- full professor, as they say, in 2010 and I have

2   continued there.  I am also the director of the Cyber Security

3   Institute at UMass, Amherst, and I have various functions as a

4   professor there.

5   Q.  So for how long in total have you been working as a

6   professor at UMass, Amherst?

7   A.  Since 1999.

8         THE COURT:  Counsel, I have read his CV and his

9   report.

10        MR. BECKER:  Your Honor, we'll just briefly go

11  through his credentials.

12  BY MR. BECKER:

13  Q.  What do your current duties include?

14  A.  As a professor as UMass, Amherst, my duties include

15  research.  My research typically involves undergrads, but more

16  often graduate students seeking a Master's or Ph.D. degree.

17  That research, as a brief summary, relates to digital

18  forensics, forensic investigation, crimes against children on

19  the internet, networks, network security and so on, as

20  detailed in the declaration that I submitted.

21      In terms of teaching, I teach a variety of classes also

22  listed in the declaration, including digital forensics,

23  computer networks, security at the graduate and undergraduate

24  level and so on.  As a service component of my job, I often

25  lead conferences where we -- and workshops -- where we review

 1  papers submitted for review by peers.  I'm one of the peers,
 2  so to speak.
 3  Q.  Have you personally been published in peer review journals
 4  and similar publications?
 5  A.  Yes.  Since the time I started as a graduate student, I
 6  started publishing in peer review conferences and their
 7  relative venues, and I published something like 80 peer
 8  reviewed papers on the topics that I mentioned.
 9  Q.  Other than your work as a professor, what other sort of
10  employment have you had in your field?
11  A.  Both as a -- during my time as a graduate student and
12  after graduation, I worked at various places, and also during
13  a year-long sabbatical, so I worked at what's called Bell
14  Labs -- it used to be owned by Lucent when I worked there --
15  Intel research labs, Sprint research labs.  I spent a year at
16  a local company in Massachusetts working on Internet
17  advertising, for example.
18  Q.  Can you describe your educational background?
19  A.  I received my bachelor's of science in applied math and
20  computer science from the University of Albany.  From there, I
21  went to graduate school and received a master's and Ph.D. in
22  computer engineering.  My dissertation focused on the internet
23  and how groups of people can use the internet to communicate.
24  Q.  How are you able to keep your skills and knowledge
25  current?

A.  Well, teaching.  Certainly, the classes I teach I always maintain the material to be current with state of the art, but certainly working on research papers, my goal is to advance that state-of-the-art and in writing those papers I have to reference, of course, related work.

     And as I mentioned before, leading peer review panels or even serving on peer review panels keeps me informed on the latest work, even perhaps prior to its publication.

Q.  Have you specifically been involved in researching work related to child pornography dissemination over the internet?

A.  Yes.  I have a number of publications that relate to that and various aspects of it.  Since 2008, I have been funded by various agencies in the United States government to work on these topics.  I was first -- I first responded to a public solicitation from the National Institute of Justice to work on novel methods and tools that can be deployed across the nation to investigate Internet-based crimes against children.

     From there, I received funding from various agencies, including the National Science Foundation.  Currently, I am funded by the Federal Bureau of Investigation to research and deploy tools on these types of crimes.

Q.  Now, to be clear, did you have any involvement in the investigation of the Playpen website?

A.  Not at all.  I was not involved.  Our tools were not used. I was not involved in that operation.

1 Q.  Did you have any involvement in the development or

2 deployment of any network investigative technique related to

3 the Playpen website?

4 A.  Not at all.

5 Q.  Are you being paid for your time in connection with

6 preparing your declaration and your testimony today?

7 A.  Yes, I am being paid by the U.S. Attorney's Office for my

8 time today.

9 Q.  Has any of this work been done pursuant to any contract

10 you have with the FBI?

11 A.  Not at all.

12 Q.  Professor Levine, I want to ask you if you can describe

13 for the Court, before you prepared your declaration in

14 preparation for your testimony, what documents and information

15 did you review?

16 A.  So this is also summarized in my declaration, but there is

17 one addition since then, but to briefly summarize what's

18 already in there, I reviewed the expert declarations of the

19 defense team, including Mr. Tsyrklevich, Mr. Young,

20 Professor Miller, Professor Reyzin and Mr. Kasal.

21     I have also read Special Agent Alfin's affidavit -- or

22 declaration, I should say; various documents related to

23 evidence that was collected that I list more specifically in

24 the declaration I submitted.  I also looked at the payload

25 components that were provided to me.  I looked at the traces

1   specific to each of the three cases.  I should clarify there
2   are three payloads as well, one for each case.
3       I looked at data from the FBI about what was recorded by
4   them as these three cases proceeded.  And since my
5   declaration, I was provided with the source code for what the
6   FBI used to generate the identifiers.
7   Q.  Is it your understanding that all of the information you
8   were provided for review was also made available to the
9   defense team?
10  A.  That's my understanding, including the source code that I
11  mentioned.
12  Q.  Did you review any related exploit or government server
13  information?
14  A.  I did not.
15  Q.  Professor Levine, I want to ask you next about some basics
16  of internet communications.  First of all, would it assist you
17  in your testimony to use a demonstrative exhibit?
18  A.  Yes, it would.
19  Q.  Have you --
20          MR. BECKER:  First of all, Your Honor, if I can
21  approach, I do have a hard copy of that, and we are also going
22  to present it using the computer.
23      For the record, we have marked this as demonstrative
24  Government's Exhibit No. 1.
25  BY MR. BECKER:

1  Q.  Professor Levine, do you recognize -- just take a look

2  through the paper.  Do you recognize Government Exhibit 1?

3  A.  I do.

4  Q.  Is that the demonstrative exhibit that you prepared?

5  A.  Yes, it is.

6  Q.  Have you also reviewed a digital copy of that on the

7  laptop in front of you?

8  A.  Yes.

9  Q.  Are they substantially the same?

10  A.  Yes.

11         MR. BECKER:  Permission to publish using the

12  electronic version?

13         MR. FIEMAN:  I have seen all their exhibits.  We have

14  no objection to any of them.

15         THE COURT:  Okay.  The exhibit may be admitted for

16  illustrative purposes and may be published.

17  BY MR. BECKER:

18  Q.  Okay.  Professor Levine, do you have the first slide on

19  the monitor in front of you?

20  A.  I do.

21  Q.  Can you just start by explaining -- at a basic level -- a

22  sort of ordinary or standard internet communication between a

23  user and website?

24  A.  What the slide shows is something that I believe many

25  people experience every day, and that's starting from the

1  laptop on the left, their own laptop, they would like to

2  contact some internet website.  Some examples are presented on

3  the right side of the slide, for example, Google or Amazon.

4  Many other websites of course exist.

5      So to do that, there's going to be a series of internet

6  protocols that are involved, that ensure that that information

7  gets to its destination, and that process has a useful analogy

8  to the postal system.

9      So if you were to advance one slide.  Thank you.  So now

10  you can seek this green line that's going from the internet

11  user to the website.  Any particular user will want to contact

12  this website and receive information back.  So how does that

13  work?  There are three protocols involved, and they correspond

14  to this postal system analogy.

15      There will be an envelope that carries a "to" address and

16  a "from" address.  The IP protocol handles that.  Similarly,

17  the mail carrier or the mail system can't deliver a message

18  unless the destination is specified correctly, and you can't

19  receive a message back from your pen pal to form a

20  communication back and forth unless you included a from

21  address or a source address, as it's called on the internet,

22  on the outside of the envelope.

23      At another level, there will be an analogy to certified

24  mail.  There's a protocol in the internet called TCP, or

25  transmission control protocol, and it provides what's called a

1    reliable service to deliver information across the network,

2    and that's again very much like certified mail.

3         Among the things that TCP does is check to make sure that

4    the data maintained its integrity as it traveled across the

5    internet.  It numbers the information as it goes across the

6    internet such that the other side can confirm that everything

7    that was numbered was received indeed.  A request can be made

8    by the other side to resend information that is missing due to

9    this numbering, and anything that is received out of order can

10   be reordered by the other side.

11        Additionally, at the start of TCP, there's a hand shake

12   where one says, are you ready to start communicating, the

13   other side says yes, I am ready to start, and then the other

14   side says yes, let's get going.

15        So then at the end, when all communications are done, each

16   side can say good-bye and say in fact everything that was sent

17   I received, I am all done, I don't need any other

18   transmissions.  So this -- I can't tell you how many times

19   this happens across the internet per day.  It must be millions

20   or billions, a very common protocol.

21        So then there's the content of the message, which is this

22   HTTP request or web request, and that might be analogous to a

23   request from a merchant to purchase something.  Here what we

24   are saying is, I would like this website that you provided,

25   and the response will be, here's the website, and that can get

1  more detailed as the website is larger and so on.

2      So that's standard.  The most important thing to note in

3  our context is that when the communication is open, it's sent

4  reliably.  The fact that there's an address, not only a

5  destination address but a source address, and the

6  communication goes back and forth, there's the type of

7  communication that that's the person you are talking to.

8      Of course, it reveals the IP address, the public addresses

9  that are assigned to both sides, and information is again

10  provided reliably.  So that's standard, what you might call

11  typical communications on the internet.

12  Q.  If I can move you to a second slide.  Can you illustrate

13  how communications via the Tor network might differ?

14  A.  So as I said at the previous slide, at the end of any

15  typical communication using TCP, of course you reveal your IP

16  address to the other side.  So Tor was designed to not reveal

17  to the website the IP address of the Tor user -- if you

18  wouldn't mind advancing one more -- and Tor, as represented on

19  the slide, is a collection of volunteers who have put up

20  computers on the internet that accept traffic.

21      Here, I put up a sample, nine of them, but the numbers are

22  in the many of thousands, and instead of directly

23  communicating with the website using the standard means I

24  described earlier, the Tor user will relay the information

25  through a series of proxies.  So without getting into the

1   extraordinary number of details at the highest level, the Tor

2   user will pick some random three -- and then if you don't mind

3   advancing once more -- and then form a connection to the first

4   one, form a connection to the second one, form a connection to

5   the third one.

6        And again, I am eliminating some details, but essentially

7   this is an encrypted connection, and then you can see there's

8   a red arrow out of the last relay.  So some important details

9   are that that first relay on the left side of the screen knows

10  the IP address of the Tor user, which is what we are trying to

11  hide from the website.  The last relay notes the website's IP

12  address but, due to the mechanisms in Tor, it does not know

13  the IP address of the Tor user.

14       That last relay on the right side of the screen also does

15  not know the IP address of the first relay because they are

16  not directly connected; there's someone in between.  The last

17  relay does know -- in cases where the connection is

18  non-encrypted -- the contents that the Tor user has sent to

19  the internet website.  There would have to be some other

20  mechanism in place to secure that content.

21       So if you connect to Amazon securely over Tor, HTTPS, your

22  browser lock turns a different color maybe, then that last Tor

23  relay would not know the contents.  But if the connection is

24  just a plain text connection, that last Tor relay would.  So

25  one limitation here, of course, is that the Tor user knows the

1    IP address of Amazon, knows the IP address of Google, these

2    web addresses that were provided, and that may not be

3    sufficient in some cases.

4    Q.   That's because in this scenario, in this slide, we are

5    looking at a Tor user who's accessing a regular website off

6    the internet?

7    A.   That's right.  It's not a website that's seeking any kind

8    of anonymity themselves, they are just allowing people to

9    connect to them through Tor.

10   Q.   If we can move to the next slide, and can you describe how

11   access to a Tor hidden service differs at all in this process?

12   A.   Yes, it differs in a number of important details.  First

13   of all, in a Tor hidden service -- again, it's the website,

14   for example -- it's the website that would like to maintain

15   its IP address as something that it would not like to reveal

16   to people that visited.  So we are going to need a little bit

17   more machinery, and there's a few steps involved.

18        So the first step is that hidden service, which is really

19   just a web server in this case.  It finds three or selects at

20   random three volunteer relays from the Tor network and, like

21   before, forms a connection out.  I am going to skip some of

22   the real details of Tor here in order to present the high

23   level.

24        But once that's created -- if you don't mind advancing

25   once more -- they will release a document or a file, which I

 1   will just call an onion file, to the world, and so that
 2   doesn't necessarily go out over the Tor network.  They might
 3   email that to their friends.  They might announce it in a chat
 4   room.  Whatever it is, they announce to the world this onion
 5   file.
 6       A Tor user will somehow come in contact with the onion
 7   file, and that's important because that onion file contains a
 8   secret, and it's a secret about forming an encrypted
 9   connection to the hidden service.  So with that secret, with
10   that key in place effectively, the Tor user will then create,
11   as before, their own circuit through the seven volunteer Tor
12   relays -- if you don't mind advancing -- again, picking three,
13   and those three bridge together with the original three, and
14   now we have a connection through this Tor network inside the
15   cloud in the diagram.
16       Now, unlike before, we have the advantage that because of
17   the onion file, no one in the middle actually gets to see the
18   plain text, even if that Tor user connects to the hidden
19   service through a standard, unencrypted, plain view protocol.
20   We do have what we had before, the left most relay closest to
21   the Tor user knows its IP address, the right most relay in the
22   diagram knows the IP address of the hidden service, but they
23   don't know each other.  If they tamper with the traffic, then
24   the encryption that's used end-to-end would detect that and
25   the packets would be dropped.  So I think that summarizes

1  everything.

2  Q.  Next I want to ask you if you can describe how the process

3  of the network investigative technique would work in this sort

4  of network setup.

5  A.  So the network investigative technique obviously is

6  relevant to these cases, and the problem, of course, that it's

7  trying to solve is that from the hidden service's point of

8  view, the IP address of the Tor user is not revealed.  So the

9  network investigative technique, as described and available to

10  me in the documents that I have read, works as follows:  The

11  FBI will put up a server and then we know -- we all know that

12  the FBI seizes control of the hidden service -- if you don't

13  mind advancing -- and at that point, they will place the NIT

14  as part of the hidden service such that our Tor user who

15  creates a connection using that onion file, all the way

16  through the Tor network as it appears on the slide, will make

17  connection to the Tor hidden service, log in, request a page

18  from the hidden service, and the Tor hidden service will

19  return to them the payload, and the exploit will travel

20  through the Tor network and arrive at the Tor user.

21      I should say -- I should go back.  After the NIT is

22  available on the hidden service but before the Tor -- before

23  the Tor user requests the page, the hidden service -- which is

24  again seized by the FBI -- coordinates with the server to

25  generate and obtain this unique ID.  That unique ID is placed

1   in the NIT.  It's tailored to this particular visitor and when

2   the NIT is returned to the Tor user, the exploit is a method

3   of access by which the payload can be executed.

4       The payload acquires information from the Tor user -- if

5   you don't mind advancing.  That information, which is really

6   -- the ID is really what we are mostly concerned with here --

7   would be returned outside of Tor.  So because it's returned

8   outside of Tor, that ID can be associated with the IP address

9   that appears in the packet sent from that Tor user.

10      So we have a full circle.  We have the hidden service,

11  it's waiting for Tor users to come.  Each user, there's an ID

12  that's generated, that's embedded in the NIT, the NIT is

13  delivered through the Tor network.  The exploit is a method of

14  access that allows the payload to run.  The payload sends the

15  message, which is that unique identifier, most importantly,

16  and that's received by the FBI server.

17      The FBI server can confirm that that is indeed a unique ID

18  that is generated.  And then we are really back to the

19  standard set of techniques with an IP address.  For example,

20  an investigator could subpoena information from an IP -- about

21  the billing address for that particular IP address, and things

22  proceed as is more typical with investigators.

23  Q.  So why is it that the IP address that's returned is

24  actually visible to the server that receives it?

25  A.  So that arrow information sent outside of Tor on the left

1    of the diagram is a standard IP based, TCP based, HTTP request

2    that I started with in the very first slide.  The standard

3    connection -- it's that analogy of sending mail through the

4    post office.  There's a return address, in our case a source

5    address, that the FBI server receives.

6        And again, the FBI server doesn't receive just one

7    message.  It's a TCP connection with our hand shake, with the

8    number of packets, recovery from loss, recovery from out of

9    work delivery and then a good-bye.  So not only that TCP

10   provides, as I mentioned before, check zones that ensure the

11   integrity of information that goes past it, and the

12   information itself is exactly the number that the FBI

13   generated prior to the NIT being delivered to the Tor user,

14   and as I might explain later, the number is so large that it's

15   difficult for someone to guess a value that the FBI might have

16   generated.

17   Q.  All right.  I want to ask you about some components of

18   this system that you've reviewed, so let's move to that.  We

19   can start with what you have described as the payload.

20       What did you review with respect to the payload?  What did

21   that consist of?

22   A.  So the three payload files that I was given, one

23   corresponded to each case.  Each payload had a corresponding

24   packet trace or PCAP file, as it's sometimes called in some of

25   the declarations.

1     Each payload had an embedded identifier just like the one
2  I described earlier.  The files had various differences, but
3  for example, one of them had a code in it that was easily
4  human-readable.  Some code is meant for a computer, other code
5  is what's called a script.  It's very easily readable if you
6  have the training, and I was able to look at that
7  human-readable code and execute each instruction.
8     These instructions gathered exactly what was described in
9  the warrant application that I reviewed.  For instance, the
10  operating system version, and I could see that the same
11  information was available in the packet traces itself.
12  Q.  Did you notice anything abnormal from the review of those
13  instructions and the packet traces?
14  A.  Right.  So the packet traces are -- there's three of them,
15  one for each case.  Each was a little bit different because of
16  the variations of -- it was a live internet trace, but they
17  all conformed to exactly the general summary that I gave
18  before.
19     For each one, I could see that there was a TCP request for
20  a connection, the other side of the hand shake, the third hand
21  shake and then I could see the web request go out.  Very
22  cleanly and very visible, without any expertise, you could see
23  in the outgoing packet that the unique ID was present.
24  There's other information that's in my declaration that I
25  alluded to, but for instance, all three cases shared a common

1  random number, a case ID.

2      When available, other information was also recorded in

3  this packet that went out, that looked like a web request,

4  including as I say the operating system or host name or other

5  information.  The FBI server responds with oh, I am sorry that

6  web page is not available, and then the connection is

7  essentially closed after tidying up any missing packets out of

8  order or things like that.

9      I was also able to, by looking at these individual packet

10 traces, confirm that these integrity checks that I mentioned,

11 these check zones, were valid.  There's in fact two check

12 zones on each of the packets going out -- and when I say going

13 out, I mean going out from the defendants' computers -- I

14 could see that they were valid, they were fine.

15     There was also no indication of various attacks that might

16 have taken place, extra packets, odd occurrences.  They looked

17 very straightforward.  They appeared to do exactly what was

18 described in the warrant and conform to, for instance, what I

19 saw in the payload.

20 Q.  Now, were the ingredients there, so to speak, in order for

21 someone to do further testing of that payload information?

22 A.  Yeah, in fact all told, that's a lot of information.  So

23 for example, I know -- I didn't personally examine them, but I

24 know that what are called the images, the record of the

25 defendants' computers as they were seized, is available.  So

1  those were the computers that these payloads were executed on.

2      The payloads are also available for executing on other

3  computers.  The output of -- in other words, the output of the

4  payload, which is the packet capture, is in a standard format

5  that's easily viewable by anyone who knows these techniques.

6  If the goal is to verify that indeed this ID appeared in the

7  packet trace, they were there.  If the goal is to verify that

8  the information that is in the packet traces conforms to the

9  warrant, those ingredients are there.  If the goal is to

10  figure out what else this payload might have done, they can be

11  run -- they can be run on other computers.

12  Q.  Now, one of the requests in this case, as you are aware,

13  is for disclosure of the exploit component.  Would it be

14  necessary to have the exploit in order to run the sort of

15  testing that you've been talking about?

16  A.  No, because the exploit is a method of access.  It's

17  equivalent or analogous, rather, to a lock picking device.  So

18  if the goal is to determine whether that identifier appeared

19  in the payload, the exploit is not necessary for that.  All I

20  need to do is look at -- if I said -- let me restate my

21  response.

22      If the goal is to validate or verify that the ID is

23  present in the packet traces, one need only look at the packet

24  traces.  If the goal is to examine what this payload did, one

25  can look at the payload.  The method of access to deliver the

 1  payload is not the same as the payload itself.

 2  Q.  Now, what if you wanted to determine whether this TCP

 3  connection was subject to some kind of attack, are the

 4  ingredients there for that?

 5  A.  So the ingredients are there.  The packet trace itself is

 6  extremely explicit.  It's low level.  It's not just a printout

 7  of the web request.  It's the actual TCP packet at the lowest

 8  level.  Reviewing the exploit would not add information to

 9  examining that packet trace.  As I said before, the packet

10  trace includes the integrity checks, the call sequence

11  numbers, all the recovery mechanisms, it's all there.

12  Q.  Professor, did you also review the code used to generate

13  unique identifiers?

14  A.  Yes.  In fact, this code is very short.  It's exactly one

15  line, because it leverages an industry standard technique.  It

16  uses an industry standard library.  It's called UI.  It uses

17  version 4 of UUID, which has the computer it runs on generate

18  a very -- well, pick from among a very large space of random

19  numbers.  It's used extremely widely.  It's used all over the

20  internet by Google for its advertisements.  It's widely used.

21  That code is easy to review.

22      I looked at the underlying library as well.  It's the

23  industry standard.  In my declaration, I did not have access

24  to that code when I stated it, but with the exception of a

25  small detail, it conforms exactly to what I stated in my

1  declaration in terms of its ability to generate numbers that

2  are unique without duplication.

3  Q.  Did you notice anything abnormal about that code?

4  A.  No, it's exactly one line.  It's entirely appropriate.

5  It's very simple.  There is not much to examine.

6  Q.  Using that particular type of code, what would be the

7  general probability of there being duplicates?

8  A.  Nil.  The exact numbers are in my declaration.  It's

9  astronomically low.  Even so, it's trivial to detect those

10 duplicates.

11 Q.  What do you mean by that, that it's trivial to detect

12 them?

13 A.  Well, if one had a list of all ID's that were generated

14 during this operation, one need only find duplicates that are

15 there.  There's no algorithm.  There's no exercise to be done.

16 There is no trick.  You could load them into an Excel

17 spreadsheet and ask them to detect them.  There's nothing to

18 do.

19 Q.  What is your understanding of whether that review was done

20 with respect to this investigation?

21 A.  As I stated in my declaration -- well, more specifically

22 you can look at Special Agent Dan Alfin's declaration, and he

23 notes that he fact checked for those duplicates.  As I stated,

24 I find it hard to believe that that was not a trivial task,

25 but I am sure he got that right.  There's nothing to do.

1  Q.  Would review of the exploit be necessary to make any of

2  those determinations about the unique identifiers?

3  A.  The exploit is a completely separate piece of code.  That

4  is not run on the server.  It's not related to this unique ID.

5  Selecting the entire code is available in this one line.  It's

6  not related to the exploit.

7  Q.  Let's move more specifically to that concept then.  I want

8  to ask you first, Professor Levine, if you could just start by

9  defining a term for us.  Could you define the term malware?

10  What is malware?

11  A.  So malware is code that through some method of access

12  executes on someone's machine, generally for some task that is

13  deemed malicious, hence the MAL in malware.

14  Q.  What are the components of malware?

15  A.  The components are apparent from my definition, actually.

16  There's a method of access, and then there's an activity that

17  happens.  I think that at a high level that describes all

18  malware.  So for example, what I mean by a method of access is

19  some malware -- some malware is -- the method of access is

20  what some people call phishing or social engineering or good

21  old-fashioned trickery.  You might get an email that appears

22  to be from a friend, and they ask you to run the attached

23  code, and that attached code does something.

24      Another method of access is, you might be given a USB key

25  from a coworker, you might find a USB on the floor at a cafe,

 1   plug that USB key into your computer, that is the method of
 2   access.  The code that runs, that was stored on that USB code,
 3   could do anything.
 4       A third might be advanced code that's written by someone
 5   to circumvent protections on your computer that were normally
 6   provided by the operating system.  That would be a method of
 7   access.  The separate component would be the task, what does
 8   it actually do?
 9   Q.  So how does that method of access differ from the actual,
10   what it does, the malicious activity?
11   A.  It differs quite a bit.  So the activity that it does, I
12   might tell you that malware on my machine sent spam,
13   unbeknownst to me, to different people.  I might tell you that
14   it recorded my key strokes so that my banking credentials
15   could be stolen.  It might be that materials were stored on my
16   computer unbeknownst to me.  But that's a different thing.
17       Perhaps one analogy that explains that is, if I tell you
18   that my house was broken into, you might say how did they get
19   in?  And I might say, they got in through the door or I might
20   say they got in through the garage or the basement.  The next
21   question has to be, what did they do when they got inside?
22   How they got in doesn't tell you what they did.
23       Then I might say oh, when they got in, they stole cash
24   from my safe.  They left materials in my garage.  They did
25   other things.  In fact, if I had started with, there was a

1  break-in at my house and they stole cash from my safe, your

2  next question has to be, how did they get in?  These are two

3  separated concepts.  Knowing one is not sufficient to know the

4  other.

5        So the same is true in malware.  If I tell you that I

6  received what's called a trojan horse, which means that I

7  downloaded a program that appeared to be a tick-tack-toe game

8  but in fact what it really did is run some other activity,

9  your next question has to be what did the trojan horse

10  deliver?  And then I might say, it was a key stroke logger or

11  I might say it stored files on my computer.  But knowing how

12  that malware got on my machine, the method of access, is not

13  the same as what it did.

14  Q.  So how does that line up with the scenario that we are

15  talking about here regarding the deployment of the NIT?

16  A.  So as I stated before, that exploit has this function of a

17  method of access, and the payload is the activity that was

18  done.  So in these cases, knowing the method of access would

19  be observable or notable from looking at the exploit.  But on

20  the other hand, the payload tells you what was done once

21  access was gained.

22  Q.  So the defendants have suggested that it is possible that

23  someone else could have used, say, the same method of access,

24  the same exploit to, for example, plant child pornography on

25  their computers.

1      First, in a general, theoretical sense, is that possible?

2  A.   Yes.

3  Q.   Would examining the exploit that was used in connection

4  with these cases support or refute that theory?

5  A.   It would not support or refute that theory because, like

6  the analogy I gave before, knowing that a computer is --

7  knowing that a method of access is available on a particular

8  computer does not tell you what else was done.  So, for

9  example, if I was to examine that exploit, perhaps one of two

10 things would happen.

11     The first thing might be that in examining the exploit, I

12 might discover that first, in executing and allowing this

13 method of access, it leaves a trace on the computer.  The

14 other might be that it leaves no trace.

15     Well, actually in the second case, if the exploit leaves

16 no trace whatsoever, examining the exploit does nothing for me

17 because I have no information to act on to look for other

18 software or malware that might use the same method of access.

19 So let's go back to that first case.

20     In examining the exploit, let's say that I hypothetically

21 discover that it does leave a trace on the computer, some type

22 of artifact that indicates that that was the method of access.

23 Having that actually still does not support or refute other

24 theories that I have about how this computer might have been

25 used by some other malware with the same method of access.

1      Like the house analogy, hearing that someone can get in
2   through my windows doesn't say what they are going to do when
3   they get there.  Examining the exploit, discovering that there
4   is information that can be gained from it or not, but whether
5   there is information that can be gained from it does not tell
6   me whether later, even if I find that same trace, what that
7   other software did.
8      This is not a property of malware.  It's just a property
9   of software; the same functions of software can appear in
10  other software.  What it does after that function is run -- in
11  the case of malware, certainly -- is anything that that
12  computer can do.  If the computer has a CPU, it can compute.
13  If the computer has storage, it can store files.  If it's
14  connected to a network, it can send things over the internet.
15  Q.  In a scenario where we are talking about malware that was
16  designed to download and store child pornography, would it
17  necessarily depend on any one particular method of access to
18  be possible?
19  A.  Absolutely not.  A method of access is just the first
20  stage -- it's just one component of malware that can do
21  anything after it.  So telling me that a computer was
22  vulnerable to a trojan horse, again my next question has to be
23  what happened next?  If you started with the malicious effects
24  of that software, my first question would then be, how did it
25  get in?  They are unrelated.

1   Q.  In terms of looking for malware itself on your machine,
2   where would you look in order to make those sorts of
3   determinations about codes that ran and what it could have
4   done?
5   A.  So if you are looking for malware, for instance what you
6   are really looking for is what did it do to your computer.  So
7   you would look for evidence of those activities.  So for
8   instance, if it's malware that sent spam, you would look for a
9   code that has aspects of it that related to an email.  If you
10  are looking for malware that is related to storing images on a
11  computer, you would look for evidence of that type of activity
12  in the program.
13      On the other hand, you could look for malware based upon
14  this method of access.  So you could look at whether files
15  that are core to the operating system have been changed.
16  Operating systems, because they are public, the files that run
17  them, the engine of the operating systems are well-known and
18  any changes in them can be easily detected.
19      There's a long list of things that could happen.  For
20  example, some malware actually prevents a computer from being
21  upgraded.  You could tell whether the computer prevents that.
22  You could test whether files have different time stamps on
23  them.  You can test whether they have their permissions
24  changed.
25      Windows computers, for example, have a very important

1    component called the registry.  It's a massive catalog of

2    permissions and access controls and configurations, and

3    there's a long list of standard entries in this registry that

4    can be looked at to look for evidence of malware.

5         There's many other components.  File systems, the malware

6    can hide in the first sectors of the file system, the last

7    sectors, in the middle.  I teach an entire course on digital

8    forensics, and we spend at least a semester going through all

9    the different places that you can examine a computer for use

10   by somebody as part of an incident.

11   Q.  So the defense has suggested that it's possible that an

12   exploit could have, for example, altered security settings on

13   the defendants' computers.

14        First, as a theoretical premise, is that possible?

15   A.  Yes.

16   Q.  Would you need to review the method of access to determine

17   what the computer's security settings are?

18   A.  No.  In fact, every owner of a computer should look at

19   their computer and look at the security settings and see

20   whether they allow for some unexpected access.  Those same

21   settings can be evaluated after an event happens.  It's one of

22   the first -- or maybe not the first, but it's definitely a

23   very critical step of recovering from some event is to then go

24   back and examine those settings.  So anyone trained in a

25   variety of related tasks, such as securing a computer,

1   recovering from an incident, investigating an incident, has a

2   list of activities, places, things they can do to examine a

3   machine.

4   Q.  You mentioned that you reviewed the defense expert's

5   declarations.  Did you see any indication of a review or a

6   finding of changed or altered security settings or a

7   particular vulnerability?

8   A.  I didn't see any in the declarations that I reviewed

9   before I wrote my own declaration, and in the response to my

10  declaration, I didn't see a note of any of those findings.

11  There was a note in that response about Mr. Young examining

12  the computer.  I didn't see it in that declaration, a

13  statement to that.  So not to my knowledge.

14  Q.  So, Professor Levine, to kind of bring this to a

15  conclusion here --

16          MR. BECKER:  Your Honor, if I could have the Court's

17  indulgence for just a quick moment, if I could have a brief

18  moment.

19          THE COURT:  Sure.

20      (Off the record discussion.)

21  BY MR. BECKER:

22  Q.  Professor Levine, to sort of bring us to a conclusion,

23  would reviewing the exploit, the method of access, help to

24  find malicious software or malware related to child

25  pornography?

1  A.  No, because as I have said, knowing the method of access
2  does not give you information about malware that might have
3  run subsequent to that, whether the malware used the same
4  method of access or a different method of access.
5  Q.  Would reviewing the exploit, the method of access, help
6  determine whether the payload was delivered accurately to the
7  defendants' computers?
8  A.  No, because in this case, the payload was delivered by the
9  Tor network.  As I explained earlier, that connection is
10  encrypted for every volunteer router along the way, and the
11  exploit is not involved in it.
12  Q.  Would reviewing the exploit help determine what commands
13  the payload executed or what it collected?
14  A.  No.  In fact, the payload is the best place to look to see
15  what commands the payload executed.
16  Q.  Would reviewing the exploit or method of access help
17  determine whether the payload data was delivered back
18  securely?
19  A.  No.  In fact, the packet traces are PCAP files, which are
20  available, are the place to look to see whether that
21  information was returned accurately.  Additionally, that
22  information is returned on systems that didn't see the
23  exploit, so it's not relevant.
24  Q.  Would reviewing the exploit help determine whether the
25  unique identifiers were chosen reliably?

1  A.   No.   In fact, we have the source codes for how those

2  identifiers were chosen, and it doesn't involve the exploit.

3           MR. BECKER:   Your Honor, those are all the questions

4  that I have for Professor Levine, unless Your Honor has

5  specific questions.

6           MR. FIEMAN:   Your Honor, may we have a five-minute

7  recess so I can change out my computer?

8           THE COURT:   That's fine.   Let me know when you are

9  ready.

10          MR. FIEMAN:   Thank you, Your Honor.

11     (Morning recess.)

12          THE COURT:   Be seated, please.

13     Mr. Fieman.

14          MR. FIEMAN:   Thank you, Your Honor.

15                      CROSS-EXAMINATION

16  BY MR. FIEMAN:

17  Q.   Good morning, Professor Levine.   We just introduced

18  ourselves over the break, but for the record, my name is Colin

19  Fieman.   I represent Mr. Tippens in these proceedings.

20  A.   Good morning.

21  Q.   I have a fair amount of ground to cover, and I am not a

22  technical person, so please, if I ask something that's

23  confusing or I just don't have it right, feel free to clarify.

24  A.   Okay.

25  Q.   Now, I just want to start -- what I am hoping is we are

1   actually going to find areas more where you agree with our

2   experts than disagree, which I think you summarized in your

3   declaration today.  So I am going to try to focus on the areas

4   where we overlap.

5        In order to do that, I would like to just get some basic

6   terminology or principles clear.

7             THE COURT:  This isn't working.

8   BY MR. FIEMAN:

9   Q.  So Professor Levine, let me start, just as a basic

10  principle, you agree that collecting reliable and accurate

11  digital evidence in internet cases can be challenging?  It's

12  not like your typical drug case or something where you

13  actually have physical drugs to analyze?

14  A.  Well, I don't have experience with drug cases, but in

15  general, forensics is a difficult problem.

16  Q.  It is.  And you have, in fact, written about some of those

17  challenges, I think, in your work.  I had the opportunity over

18  the weekend to try to read your Efficient Tagging of Remote

19  Peers article.  Is that an article that you presented with

20  some cowriters?

21  A.  Yes.  Do you have the article here so I can verify what we

22  are talking about?

23            MR. FIEMAN:  If I may approach, Your Honor.  We'd

24  like to have this marked as Exhibit 1.  There should be a

25  bench copy as well.  It's an article from Professor Levine,

1  and copies have also been provided to the prosecution.

2  A.  Yes, this appears to be the article I have written.

3  BY MR. FIEMAN:

4  Q.  Is this an accurate quotation from your article -- I think

5  there's a typo in there, because I did capture it from the

6  original -- but as a basic principle, "strengthening

7  techniques used in network-based criminal investigations" --

8  and some of those concerns have been addressed by, for

9  example, the National Academy of Sciences, calling for a

10 scientific overhaul?

11 A.  So I am sorry.  Are you asking me to confirm that this is

12 in my article, or are you asking me to confirm the statement?

13 What exactly are you asking?

14 Q.  Are you confirming that's a correct statement of what the

15 National Academy of Sciences is calling for?

16 A.  Yes.  The reference in -- the article referenced that

17 report which came out a number of years ago talking about

18 forensics, broadly ballistics, digital evidence and so on.

19 Q.  Correct.  I am going to narrow as we go.  I think there's

20 a typo.  I think it says "investigations beings"; it should be

21 "investigations begins"?

22 A.  I apologize.  There was no copy editor for these

23 documents.  It's just me.

24 Q.  I hope you review your code a little more carefully.  Did

25 you have a chance to proofread that article?

1  A.  Did I have a chance to proofread this?

2  Q.  Yes.

3  A.  Yes, I tried, certainly.

4  Q.  Now, is it fair to say that one way to ensure that digital

5  evidence, forensic evidence in a particular case, is accurate

6  and reliable for a jury is to have qualified experts review it

7  for possible errors?

8  A.  The evidence that was collected?

9  Q.  Any evidence.  Before evidence -- digital evidence is

10  presented to a jury, is it fair to say that one way to ensure

11  that it's reliable and accurate is for qualified experts to

12  review it?

13  A.  Yes.  I assume you are talking about digital evidence that

14  was, for instance, seized from the scene?

15  Q.  Correct.

16  A.  Yes.

17  Q.  Now, one area of expertise that I understand you have is

18  with peer-to-peer networks or P2P networks; is that correct?

19  A.  That's correct.

20  Q.  Are you familiar with a software or program called EP2P?

21  A.  I am not very familiar with it.  EP2P is a program that I

22  honestly just know its name.  I was not involved in its

23  construction design.  I have never seen it, never held it,

24  never seen it demonstrated, so I don't know much about it at

25  all.

1  Q.  So you haven't had a chance, for example, to review EP2P

2  software?

3  A.  No.

4  Q.  So you are not in a position to comment on it; is that

5  correct?

6  A.  Well, it depends on what your question is, but no.

7  Q.  Now, would you agree just as a general matter, not based

8  on any specific knowledge, that if a defendant was charged

9  with file sharing via a P2P network or over a P2P program, his

10  computer expert should be able to analyze that software to

11  make sure it was identified correctly?  Do you agree with that

12  as a general statement of principle?

13          MR. BECKER:  Objection to relevance.

14          THE COURT:  He can answer.

15  A.  I am sorry, can you repeat the question?

16  BY MR. FIEMAN:

17  Q.  Just as a general matter, focussing on P2P networks,

18  because that's something you are particularly familiar with,

19  would it be a fair statement that if a defendant was charged

20  in a criminal case based upon identifying information

21  collected on a P2P network, that his expert should be able to

22  analyze and check the software that was used to collect that

23  information?

24  A.  If you are asking my opinion on a legal matter --

25  Q.  No, just as a general matter of principle.  If you are

1    doing work as an expert, is that a fair statement?

2    A.   What principle?  Sure, I don't know what principle you are

3    referring to.  In general fairness or a legal principle or...?

4    Q.   As general fairness and to ensure accuracy...

5    A.   Accuracy of the evidence collected over the P2P network?

6    Q.   Yes.

7    A.   For instance, they could look at the evidence itself.  One

8    of the ways in which you might provide that fairness is to

9    look at the tool that was used; it might not be the only way.

10   Q.   Okay.  What about looking at the P2P software itself?

11   A.   Which P2P software?  The one used by the client or the one

12   used by the investigator?

13   Q.   The one used by law enforcement.

14   A.   That, in addition to other methods, would be one way.

15   Q.   Now, Professor Levine, I understand that the word NIT or

16   Network Investigative Technique really covers could relate to

17   a lot of different stuff, but have you ever worked on a case

18   involving a NIT?

19   A.   So why don't you define NIT, because I believe -- because

20   you are describing it so broadly, I am not sure what you are

21   referring to.  My understanding of a NIT is that it refers to

22   the techniques used in this case as I described in my earlier

23   statements, and in that sense, this is the only case that I

24   have worked on that involves a NIT.

25   Q.   Okay.  Are you familiar with a prior FBI operation called

1  Operation Torpedo?

2  A.   Only from reading about it in the news.

3  Q.   Okay.  Are you aware that defense experts, Professor

4  Miller and Shawn Kasal, actually worked on the Operation

5  Torpedo case?

6  A.   Only as described in their declarations.

7  Q.   And you are aware also, from Robert Young's declaration

8  which you say that you reviewed, that he's an expert in

9  forensic analysis, digital analysis?

10  A.   I am aware that he wrote that, yes.

11  Q.   Have you ever been qualified in a court or any judicial

12  proceeding as an expert in forensic evidentiary analysis?

13  A.   Not in a court proceeding, no.

14  Q.   You say that some of your research is currently funded by

15  the FBI; is that correct?

16  A.   Yes.

17  Q.   How much funding are you receiving and over what number of

18  years or terms?

19  A.   The current contract is for -- this is from memory, but I

20  believe these are correct.  The current contract is for

21  $400,000.  It's over a 12-month period.  That $400,000, for

22  example, covers what's called the overhead of the university,

23  a variety of costs and so on.  Does that answer your question

24  sufficiently?

25  Q.   It does.  Thank you, professor.

1       Now, I just want to be clear on what you have looked at in

2   connection with this case in terms of code or components and

3   what you have not had the opportunity to look at.  So I just

4   want to clarify that.

5   A.   Okay.

6   Q.   Now, have you in fact looked at the exploit component or

7   the code for the exploit?

8   A.   No.

9   Q.   Have you looked at the server component?

10  A.   I have not looked at the server component, but as I stated

11  earlier, I did look at the code that generated the identifier.

12  I don't know if you want to call that part of the server or

13  not.

14  Q.   I understand that things can sometimes overlap, and it's

15  not always easy to make different hard and fast boundaries

16  between various components; is that fair?

17  A.   That's fair.  In fact, I might include in that overlap the

18  packet traces because that includes responses from the server.

19  Q.   Now, in your declaration, in paragraph 3, you forthrightly

20  disclose that you did not review the source code or executable

21  for the exploit that deployed the NIT payloads.  I have

22  that on the screen.  Is that, in fact, from your declaration?

23  A.   That appears to be from the declaration.

24  Q.   You referenced -- you used the word "payloads" plural?

25  A.   Well, there are three cases involved here, and there were

1  three payloads that were given to me.

2  Q.  On page 4, line 1, of your declaration you reference

3  payloads that were generated in connection with this case.  Do

4  you recall that?

5  A.  I don't.  Do you want to point me to that line in my

6  declaration?

7        MR. FIEMAN:  Your Honor, I am referencing docket

8  58-1.  All my references are to Tippens dockets for clarity,

9  Your Honor, and this will be on page 3, paragraph 4, the last

10  line, carrying over to page 5.  If I may approach the witness.

11  BY MR. FIEMAN:

12  Q.  Do you have a copy of your declaration with you?

13  A.  I do have a copy in front of me.

14  Q.  I just want to read that sentence into the record -- and

15  correct me if I am misreading it -- "The bespoke payload" --

16  that means sort of the custom payload for this operation,

17  correct?

18  A.  Yes.

19  Q.  Okay -- "carried a unique identifier that was generated by

20  the FBI" -- we've already talked a little bit about that --

21  "as well as a case identifier common to all payloads generated

22  for the Playpen operation."  So again, there's a reference to

23  two things there.  One, multiple payloads and secondly, them

24  being generated for the individual cases.

25     Now, my question is, were there multiple payloads that

1   were used in connection with this NIT?

2   A.  So to clarify what I meant in my statement is that I was

3   given the three payloads.  I am referring to those Playpen

4   payloads that I was given.  They were different because each

5   one, as I indicated in the declaration, contained or had

6   embedded in it these unique identifiers.  So that's why I used

7   the word "generated."  It's the embedding of the unique

8   identifier.

9   Q.  Thank you.  Professor Levine, do you know who wrote the

10  code for the payloads?

11  A.  I don't.

12  Q.  Do you know when it was written?

13  A.  I don't.

14  Q.  Do you know if it is the same or different from the NIT

15  payloads that were used previously in Operation Torpedo?

16  A.  No, I don't.

17  Q.  Now, just to back up for a second, on your slide that

18  dealt with NIT investigative techniques, you had indicated

19  while mapping the route of the NIT that the NIT was downloaded

20  by the user at some point in this investigative process; is

21  that correct?

22  A.  I see that on the slide.

23  Q.  And that would have been done, based on the information

24  you have about this case, without the user's knowledge;

25  correct?  It was done in secret?

1  A.  Based on the information I have in this case, that's

2  correct.

3  Q.  I don't really want to debate whether this is malware or

4  not in our terminology, but it is fair to say that commonly,

5  when we talk about malware, it is fair to describe it as code

6  through some method of access to a computer, without the

7  user's knowledge or consent, performs functions on the

8  affected computer that the users did not know or want?

9  A.  Are we talking about the NIT or are we talking --

10  Q.  We are talking about malware in general.

11  A.  Okay, so we are changing from the NIT?

12  Q.  Yes, that's why I was saying in general at the beginning

13  of the question.

14  A.  Sure, those are among the components of malware.

15  Q.  Thank you.  Now I want to spend some time focussing a

16  little bit on the exploit component, so that's where I am

17  going next.

18      As I indicated, I understand that you want to distinguish

19  between the various components as much as possible to keep

20  things clear; is that correct?

21  A.  The components of the NIT, yes.

22  Q.  Is it fair to say that it's called "Network Investigative

23  Technique" because these components work in conjunction with

24  each other?

25  A.  I didn't invent the terminology.  When I referenced

1  Network Investigative Techniques, I am talking about this

2  entire process, so that it's clear to the Court.

3  Q.  Well, based on your knowledge of this process, is that

4  fair, that these components work in conjunction with each

5  other and all together they make up the NIT?

6  A.  Yes.

7  Q.  Now, do you agree or disagree that the exploit, the

8  exploit component, can make fundamental changes to a

9  computer's data and disable its security settings?

10 A.  So, again, I haven't examined the exploit, so just

11 speaking generally, when I say the exploit, I am referring to

12 the method of entry that allowed this payload to execute.  As

13 I said in my earlier testimony, I can speculate that this

14 exploit may leave some changes behind or it might not.

15 Q.  So again, this is actually a statement from earlier

16 testimony by Agent Alfin that an exploit can make -- and we

17 are speaking generally -- can make fundamental changes to a

18 computer's data and disable its security settings.

19     Do you agree or disagree with that statement?

20 A.  If I interpret the statement to mean can or cannot, then

21 yes, I agree.

22 Q.  It can do those things.  And you have not seen the

23 exploit?

24 A.  I have not seen the exploit.

25         BY MR. FIEMAN:  And just for the record, Your Honor,

 1  this is in our exhibits, but I am referring to testimony
 2  that's before the Court on the screen from Agent Alfin on
 3  October 11, 2016.
 4  BY MR. FIEMAN:
 5  Q.  So you are in agreement with Agent Alfin that it's
 6  possible for exploits to do those things, make fundamental
 7  changes to data and disable security settings?
 8  A.  The exploit is undefined as a piece of software, yes, it's
 9  possible or it might not.
10  Q.  Correct.  We don't know.  You don't know because you have
11  not seen it, correct?
12  A.  I have not seen it.
13  Q.  Neither have we, so there we are.  In fact, I think
14  Professor Miller -- you've reviewed his declaration that was
15  submitted originally in the Michaud case but also in
16  connection with this case?
17  A.  I believe we are referring to the same declaration.  I
18  read the one I referred to in my declaration.
19  Q.  Just for the record, there's only been one declaration.
20  A.  That's the one I read.
21  Q.  I promise you I will try not to lead you down the garden
22  path on records you have not seen.
23      So in Professor Miller's declaration -- I have it on the
24  screen now, paragraph 4 -- he makes a couple of statements,
25  and again, I am trying to find areas where we can agree.

1  A.  Uh-huh.

2  Q.  He says that "a computer system that has been exploited

3  has been fundamentally altered in some way," and he goes on to

4  talk about how, as a result of that, "the computer may crash,

5  lose or alter data, not respond to normal input or it may

6  alter any of the settings on the system.  Depending on the

7  exploit, it can affect the security posture of the computer

8  going forward."

9      Now, do you agree or disagree with that summation?

10 A.  I don't agree with the entire quote that you've provided.

11 Q.  And I understand that your disagreement may arise from the

12 fact that you've described to the Court the exploit as a key,

13 correct?

14 A.  Can I tell you how I disagree?

15 Q.  Absolutely.

16 A.  So this first statement is very absolute.  A computer

17 system that has been exploited has been fundamentally altered

18 in some way; it may or may not have.  We don't know.  So I

19 will give you an example of an exploit that does not

20 fundamentally alter a computer in some way.

21     I may approach you and I may call you and say, oh, I'm

22 here -- I am sorry, I don't want to use you as an example.  I

23 may approach someone and say:  I'm here with your child.  I

24 really need to know the password to your email because your

25 child needs to go home.  I get the password and I log in as

—

1  normal.  There's no alteration to the computer.  That's a

2  method of access that does even not touch the computer.  So I

3  think that first statement, first of all, is way too broad.

4  Q.  It's broad, in fact, because at least the defense experts

5  don't know what this exploit looks like, correct?

6  A.  No, I don't agree that that's a description of my

7  reasoning.

8  Q.  Okay.  You are aware that we have not seen the exploit,

9  correct?

10  A.  Yes, I am aware of that.

11  Q.  You have not seen the exploit?

12  A.  I have not seen the exploit.

13  Q.  So by some standards, some generalization is inevitable

14  given that we don't know what this actually did, correct?

15  A.  Yes.

16  Q.  As a generalization, do you agree with Professor Miller's

17  statement that exploits are capable of doing all of these

18  things?

19  A.  I agree with the statement that they may alter -- may

20  alter -- any of the settings on the system.  If that's what

21  you are asking me, I agree with that.

22  Q.  And also delete or lose or change data, that may happen as

23  well?

24  A.  If that's part of the method of entry.  I am restricting

25  the exploit to the method of entry.  If you are referring to

1  what happens after the entry, yes, it's also possible after
2  the method of entry to then crash, lose or alter data.
3  Q.  Well, both Agent Alfin in his October 11th testimony, and
4  Professor Miller, are speaking specifically and directly to
5  exploits.  Now, I understand you may not agree with them, but
6  you aware of the context of their statements, correct?
7  A.  Yes.  I don't think we disagree.  I think you are right, I
8  think we maybe have a disagreement about definitions.  But I
9  agree that these things are all possible on a computer for
10 software that can run.
11 Q.  That possibility is -- certainly in a case where an
12 exploit does that, it's much more than a key, correct?  It's
13 actually not just going into the house, but moving the
14 furniture or shredding documents, altering data or leaving the
15 door open for other people; that's more than just a key if the
16 exploit is doing that?
17 A.  So the way you've described it is beyond the method of
18 entry.  If you move around the furniture, then yes.  As I
19 stated, malware can have multiple goals, or rather have
20 multiple components.  One of them is the method of entry, and
21 the other would be what it does once it gains entry.  So that
22 would be, for example, altering the data perhaps maliciously.
23 So if you would like to put this all together in the
24 components of malware, I certainly agree with that.
25 Q.  Well, again these statements from both Professor Miller

1   about the exploit component -- I understand that you don't

2   necessarily agree with them in their entirety; is that fair to

3   say?

4   A.  I agree with them in parts, and I think -- I agree with

5   them because if I realign what they are saying with my

6   definitions -- for instance, as I stated, in order to gain

7   entry, some things may be done, there may be malicious

8   activity afterwards.  These components can happen on the

9   system.  I agree.

10  Q.  And I you understand why you want to use your definitions,

11  but you can understand why we are concerned about maybe the

12  definitions that Agent Alfin and Professor Miller are using

13  and where these boundaries might be drawn, correct?

14  A.  Yes.

15  Q.  Now, in terms of the exploit being restricted and just

16  being a key in this case, you are basically relying on

17  information that's provided to you by Agent Alfin, correct?

18  A.  Yes.  There are various statements from the declarations

19  that I rely on to do this.

20  Q.  In fact, in paragraph 9 of your declaration, this is one

21  example where you say we know from Special Agent Alfin's sworn

22  statement that the exploit was restricted to allowing the

23  payload to be delivered and executed, correct?

24  A.  Yes, I wrote that.

25  Q.  So is it fair to say that the entirety of your information

1  about what this exploit did or did not do, comes from Agent

2  Alfin's declarations?

3  A.  Yes.  I mean, "entirety" is a strong word there.  If you

4  want to talk about the quote that's up here --

5  Q.  I just want to know about your personal knowledge, if any,

6  about what this particular exploit did or did not do.  That's

7  all I am asking about.

8  A.  You are correct.

9  Q.  All right.  Now, setting aside what the exploit did or did

10  not do and what we may or may not know about it, let's talk a

11  little bit about what we might be able to find out about what

12  it did without looking at the exploit itself?

13  A.  Uh-huh.

14  Q.  I think you testified earlier about how you would expect

15  that if there were changes, if there was some kind of change

16  to the security settings or lost data, you should be able to

17  kind of reverse engineer it from the client's hard drive?

18  A.  That's not what I said.

19  Q.  Okay, then please correct it.

20  A.  What I said was that in the case of a method of access --

21  what I was referring to was malware.  So in the case of the

22  method of access from malware, it may have left a trace.  It

23  may have altered things.  It may not have left a trace, okay.

24  So in the first case, if it doesn't alter anything, an example

25  of that is the phone call I gave before, then there's nothing

1   to do there.

2        In the other case, the malware or method of entry might

3   alter the computer.  So if on another computer you see those

4   same artifacts, you might conclude that that same method of

5   access was used.  And then I also clarified that that does not

6   tell you any of the following activities since different

7   software could reuse that same method of access.

8   Q.  All right.  So let's just use the word "malware" broadly.

9   You had indicated in paragraph 16 of your declaration that,

10  assuming for the sake of argument that the exploit did

11  something to the computer beyond just opening it, you would

12  expect -- and I am looking at the last sentence -- that "such

13  malware would need to reside in permanent storage, making it

14  easier to find by experts, and yet it has not been found."

15       Is that an accurate statement of your declaration?

16  A.  Well, the full quote is --

17  Q.  Please read it.

18  A.  Okay.  "It is reasonable to expect that malware designed

19  to furtively store images on the defendants' machines would

20  also have the ability to later retrieve the images."

21       So here, I am talking about a specific kind of task for

22  that malware.  The task I am referring to is both the storage

23  and retrieval of the images.  So within the context of that

24  task, what I write next is, "In order to allow retrieval after

25  a device reboot, in that case storage retrieval after a device

1  reboot, the malware would need to reside in persistent

2  storage, making it easier to find by experts."

3      So what I am saying is, this particular type of malware,

4  for instance, it might store child pornography, has not been

5  found, to my knowledge.

6  Q.  We are going to talk a little bit more about that, and

7  particularly about the reboot.  But I do want to stick with

8  these general principles about computer code or malicious code

9  that may be on a computer before we get to specifics.

10  A.  Okay.

11  Q.  Now, Agent Alfin has also testified -- this is again

12  attached to our pleadings.  He was asked earlier about malware

13  in general --

14  A.  Uh-huh.

15  Q.  -- and was questioned about whether programs can be

16  written so that there is no code left behind on the computer

17  once that information has been sent somewhere else.  Do you

18  understand the question he's being asked?

19  A.  Yes.

20  Q.  He answers -- this is on a separate slide.  Agent Alfin

21  there is agreeing that malware can be designed so in fact

22  there is no code left behind on the computer that can show

23  that it was there, tell a forensic specialist like Robert

24  Young what it did or all those other things that may be

25  important to know.

1  A.   Are you asking me a question?

2  Q.   If you agree or disagree with that statement.

3  A.   I don't agree with what you said.  I don't think that's a

4  fair reading of the quote in front of me because I believe you

5  skipped an important phrase between the two hyphens, the end

6  dashes.

7  Q.   He is talking here about the information designed to steal

8  someone's information, correct?

9  A.   He's talking about malware is generally designed if you

10 are going to steal someone's information -- and I would like

11 to point out that is a different scenario than the quote you

12 took from my declaration, which was about malware that's

13 stored and retrieved after reboot -- that information,

14 stealing someone's information and then leaving doesn't

15 require you to stay there.

16     So that's why such malware could delete itself.  But if I

17 am going to write malware that stores images on someone's

18 computer, and I would like to later retrieve it, then I do

19 need to stick around because how can I respond to commands

20 that request retrieval?

21 Q.   Well, you are aware, are you not, that the malware in

22 these cases, the NIT components -- excuse me, because we don't

23 need to agree on the word.  The NIT components were deployed

24 against the various defendants in these cases back in February

25 and early March of last year; are you aware of that timeframe?

1  A.   That's what I understand.

2  Q.   Okay.  And just in terms of malware in general, whether

3  it's to steal somebody's information, alter or delete files,

4  create a remote storage for pornography, do you agree or

5  disagree that any of those types of malware may be written so

6  that there's no code left behind?  Is that possible?

7  A.   No.  Again, you are including in that the type of malware

8  that would store and then retrieve.  So in order for the

9  retrieval to work correctly, I don't see how the malware could

10  --

11  Q.   I am not talking about retrieval --

12  A.   I'm sorry, could you clarify your question?

13  Q.   I'm talking any type of malware that either alters or

14  changes data, alters or changes security settings, stores

15  unwanted data or images on a computer remotely, any of that

16  type of malware, whatever its malicious purpose may be, is it

17  possible for code to be written, the code itself, that does

18  not leave a trace on the computer?

19  A.   For the examples you just gave, yes, it's possible.

20  Q.   For all those examples, correct?

21  A.   I believe so, as I understand you to say them.

22  Q.   Now, in this case, you actually indicated that at least

23  some of the NIT code -- and again, these definitions are hard,

24  but whether it's the exploit or the payload, some part of the

25  NIT code may not have been left behind on the target

 1  computers; is that a fair statement?

 2  A.  Well, I haven't examined those computers, but given that

 3  you are requesting this information and you have those

 4  computers, I assume that you don't have access to that

 5  information.

 6  Q.  Well, in fact you wrote -- if you will turn to paragraph

 7  4 -- excuse me, paragraph 4 on page 5 of your declaration --

 8  A.  Uh-huh.

 9  Q.  Turn to page 4, lines 7 and 8.  It's the last sentence,

10  "The exploit and payload did not persist on the defendants'

11  computers after execution."

12  A.  What's your question?

13          THE COURT:  Just a minute, counsel, where are you

14  looking?

15          MR. FIEMAN:  If you look at docket 58-1, Professor

16  Levine's declaration on page 4, Your Honor, it's lines 7 and

17  8.

18  BY MR. FIEMAN:

19  Q.  Now, in reference to the NIT in this case, you state that,

20  "The exploit and payload did not persist on the defendants'

21  computers after execution"; is that correct?

22  A.  I state that because I am assuming that if they were there

23  and available -- what I mean by "persist" is there and

24  available -- you would not be requesting them from the

25  government.

 1  Q.  Okay.

 2  A.  So by persist, I mean they are not available or ready made

 3  for you.

 4  Q.  Did you look at any of the defendants' hard drives or data

 5  storage devices in connection with this case?

 6  A.  I did not.

 7  Q.  Did you ask to get a mirror image hard copy or do that at

 8  any point?

 9  A.  I did not.  So you are right, that's a logical conclusion.

10  Q.  I am not impugning your logic.  I just want to follow it.

11  Again, you indicated that you had read Robert Young's

12  declaration in connection with this case?

13  A.  Yes, I read that declaration.

14  Q.  And in paragraph 7 of his declaration, he talks about some

15  of the things that may have gone on, given the NIT on the

16  defendants' computers, and that may include instructions that

17  mask or conceal the object code -- we'll talk a little bit

18  more about that -- but basically the code, making it possible

19  to reverse engineer the code, and he also talks about

20  encryption and some technical things that are already kind of

21  over my head.  And then he also talks about that some data may

22  even be lost when a program ends or is shut down or rebooted.

23      Again, these are generalizations, but do you dispute any

24  of his description of some of the challenges that would come

25  with trying to work backwards from the defendants' devices?

A.  So, putting aside disagreements about what the NIT is, so let's talk more, as you said, as you suggest, let's talk about the exploit and the payload.  If the exploit is not available to you, than yes -- sorry, did I say that correctly?  The payload is available, and so looking at that material is not as hard.  But yes, the exploit, which is not available, would have -- I am not sure of your question.  You are asking if that exploit is still available on the defendants' computers, could it be reverse engineered, would there be challenges in discovering it, yes.  Possibly, yes, presumably because you haven't found it.

Q.  If you are having trouble keeping track of terminology, imagine the trouble we are having, but I appreciate your efforts to clarify.

Now, you did spend a fair amount of your declaration talking about sort of in general well, we don't need the NIT -- all the NIT components, there's some we have got and some we haven't.  We don't need all of those because again, you would expect to be able to find evidence of what we are looking for on the storage devices of our clients.  Is that a fair general statement of what you talked about at some length?

A.  Yes, because if what you are looking for is third-party malware that's responsible for evidence that's found on the computer, that's not related to the method of entry.

1 Q.  It's not what we are looking for.  That may be part of --

2 A.  Could you clarify that?

3 Q.  We are looking for what the NIT did.  That's what we are

4 trying to figure out.

5 A.  You are looking for the method of access?

6 Q.  We are looking for whether the exploit, as you previously

7 agreed, could have changed or altered data or changed security

8 settings, for example.

9 A.  So you are looking for the trace that might be left behind

10 from an exploit that ran and had a method of entry?

11 Q.  We are looking for the exploit to know what it is.

12 A.  You are looking for the task that occurred in the payload?

13 Q.  We are looking for what the exploit is.

14 A.  So you are looking for the method of entry?

15 Q.  No, we are not agreeing about that because --

16 A.  I agree.

17 Q.  -- I think we already agreed, based on the prior

18 statements, that some exploits can change data, correct?

19 A.  Some methods of entry might change data, yes.

20 Q.  Now, just in terms of -- just finishing up with this

21 problem of trying to work backwards from our clients' devices,

22 I want to direct you again to some testimony from Agent Alfin

23 that has been provided to the Court as part of the *Jean*

24 transcript on October 11, 2016.

25     Again, we are talking in general just about some of the

1  data analysis problems that attend this type of case, whether

2  it's an NIT case or malware case, however you want to define

3  it, okay.  And there was a question that was directed to Agent

4  Alfin about:  "Are you familiar with what happens to data on a

5  computer over time that's become overwritten," correct?

6      And the answer there is:  Yes, among other things, when

7  the computer reboots, it's going to clean up data files, which

8  I understand may change or delete or compress files, correct?

9  A.  Depending on the operating system.

10 Q.  Depending on the operating system.  So again, continuing

11 with Agent Alfin's statement, so if there were changes to the

12 computer -- and I think we are referencing a defendant's

13 computer -- "eventually they can be corrected or deleted or

14 removed."  Does that seem like a fair general statement to

15 you?

16 A.  Yes, it could be.

17 Q.  Also, if you update your operating system, there may be

18 changes to the data?

19 A.  Which data, the user data or the operating system data?

20 Q.  Data that is stored on the system.

21 A.  Certainly, the operating system data would be changed if

22 that's what was upgraded.

23 Q.  So computers are inherently rewritable and changeable all

24 the time; is that a fair general statement from Agent Alfin?

25 A.  General purpose computers do general things, absolutely.

1  Q.  Now, there's a reference, as the testimony continues, to

2  the *Cottom* case.  Have you heard that case referenced?

3  A.  Only in the declarations that I have read.

4  Q.  Just for clarification, that was one of the cases that

5  involved Operation Torpedo -- I don't expect you necessarily

6  to know that, but clearly, you can see from this question and

7  answer that Agent Alfin is referring to a prior case involving

8  an NIT, and he was asked:  "You testified that in the *Cottom*

9  case, the software that you analyzed didn't make any

10 fundamental changes?"

11      Do you see that question?

12 A.  This is a question to Agent Alfin?

13 Q.  Yes.

14 A.  Okay.

15 Q.  And I am going to ask at the end if you agree or disagree

16 with that statement.

17      MR. BECKER:  Objection, just briefly, Your Honor.  I

18 think this may just be an error.  I don't believe this is

19 Agent Alfin's testimony, and I would just ask if counsel can

20 clarify.  I think this is Mr. Miller's testimony.

21      MR. FIEMAN:  I will double-check the record, but it

22 doesn't matter if it's Agent Alfin or Professor Miller -- and

23 I will clarify it at the break --

24      MR. BECKER:  I think it doesn't matter in terms of

25 the clarity of the record, but I do not believe this is

1    Special Agent Alfin's testimony.

2              MR. FIEMAN:  I will double-check the excerpts.

3              THE COURT:  What's the question to the witness?

4    BY MR. FIEMAN:

5    Q.  Do you believe that it's possible to know whether there

6    were fundamental changes to the computer as a result of an NIT

7    without it having been analyzed?

8    A.  I don't have access to the *Cottom* case.  I don't have the

9    materials.  I am not sure what you are asking me.  If you

10   want, I can read this and then try to agree with it, but I am

11   so uninvolved in the other case, I am not sure what you are

12   asking me.

13   Q.  I am going to move on because I think we also need a

14   clarification.  But let me focus on an issue just in terms of

15   the payload components at this point.  We talked about

16   exploits and malware in general.  Now I want to talk about the

17   payloads.

18   A.  Okay.

19   Q.  I am going to need some help because I have never taken a

20   computer class, and I don't know code.  But I understand

21   certain general principles as this:  Broadly speaking, there

22   are two types of code, source code or code that is initially

23   written by a programmer, correct?

24   A.  You said there were two types?

25   Q.  Well, is that one type of code, source code?

1  A.  The original source code, yes.

2  Q.  And is that also sometimes known as human-readable code?

3  A.  Yes, that's an example of human-readable code.

4  Q.  And then there is a different type of code that's called

5  sometimes object code or binary code, correct?

6  A.  Yes, the result of compilation.

7  Q.  When you say compilation, if I understand the process,

8  you'll have a programmer write out the code in a programming

9  language.  That human-readable written code will then be

10  converted into zeros and ones, binary language which will give

11  the computer instructions to run.  Is that a fair

12  generalization?

13  A.  Yes, absolutely.

14  Q.  So if you know -- if you have the source code, and you

15  know the programming language that was used to write it, you

16  can go through and analyze it and understand what the code

17  instructed the computer to do or not do, correct?

18  A.  You can certainly try.

19  Q.  But with binary code, that's often referred to as not

20  human-readable, correct?

21  A.  Well, there are fewer experts who can take care of it, but

22  yes, it's definitely not as easy as human-readable code, the

23  binary code.  You can run it, which is a nice advantage over

24  source code.

25  Q.  Now, you said you reviewed human-readable code in

1  connection with the payload; is that correct?

2  A.  On the stand here today?

3  Q.  Yes.

4  A.  So what I was referring to is, embedded within the payload

5  there is scripting language.

6  Q.  What is scripted language?

7  A.  There was particular human-readable code, I believe it was

8  called the bash script.  I don't know how technical you want

9  me to get, but there was a script embedded inside the

10  executable, at least one of them.

11  Q.  What about non human-readable?

12  A.  There was also non human-readable code in there.

13  Q.  So if I understand your testimony correctly, you testified

14  that you looked at and analyzed the payloads, correct?

15  A.  I did.

16  Q.  And you looked at human-readable code, right?

17  A.  There was some human-readable code embedded in it.

18  Q.  There was also, however, other code that was not

19  human-readable?

20  A.  There was human-readable code, there were pieces of text

21  in the code, and there was compiled code, this object code

22  that you referred to.  All three were in there.

23  Q.  What did you do with those portions of the payload code

24  that were not human-readable?

25  A.  I didn't read them.

1  Q.  You didn't read them?

2  A.  No.  So let me clarify.  So I didn't -- they are not as

3  easy to read as you would say.  I looked through them.  I

4  extracted the text that was embedded in that quote-unquote non

5  human-readable code, and that text corresponded, for example,

6  to the unique identifier that I saw -- or other output that

7  appeared in the packet traces.

8  Q.  So you were able to read part of it?

9  A.  I was able to read part of it; only part, as you are

10 saying.

11 Q.  Previously, you had testified that you analyzed the

12 payload code, but only those parts you could understand; is

13 that correct?

14 A.  Yes, I apologize.  To clarify, as part of my analysis, I

15 extracted the human-readable code.  I apologize if that was

16 not clear.

17 Q.  So there are, consistent with Mr. Tsyrklevich's

18 declaration, parts of this payload that, at least according to

19 your testimony just now, are not in a human-readable format?

20 A.  They are not in a human-readable form, but they can be

21 executed.  For example, there are people who can read this,

22 let's say, a computer scientist readable code.  It's not

23 impossible to read the code.  I didn't do it.  I didn't do it.

24 But it's not impossible to do.  And you can run it.  It's not

25 a dead-end, but it's certainly challenging, I agree with you.

1   Q.  It was a dead-end to you, though --

2   A.  It was not a dead-end.  I didn't elect to do it.  I didn't

3   find it necessary because my concern was whether or not the

4   exploit would help me, and I didn't see how reviewing the

5   payload more than I did was necessary at the time.

6   Q.  That was your opinion of what was necessary or not

7   necessary?

8   A.  When referring to the exploit, I found that, as I

9   testified earlier, for example, reviewing the exploit would

10  not tell me whether the packet traces would return correctly,

11  it would not tell me whether the identifier was created

12  without error.  It would not tell me whether malware was run

13  on the machine using the same method of entry.  It would not

14  tell me whether the payload was delivered without error as it

15  was with Tor.  So those questions didn't seem relevant to

16  going further than I did at the time of the payload.  But that

17  doesn't mean I couldn't have gone further.

18  Q.  But you understand, it's ultimately for the judge to

19  determine what may be relevant or not relevant for the --

20  A.  Just the questions I personally was trying to answer, I

21  wouldn't presume.

22  Q.  They were fairly limited, right, because you didn't ask to

23  see the exploit, correct?

24  A.  I didn't ask to see the exploit.

25  Q.  Okay.  And you didn't deal with the non human-readable

1  parts of the payload, correct?

2  A.  I did deal with it.  For example, I extracted text from

3  the non human-readable parts that I could see corresponded to

4  the packet traces.

5  Q.  The extract part, but there are lots of parts --

6  A.  There was lots of other parts that I did not.

7  Q.  What about the server component?  Did you look at the

8  server component?

9  A.  I did not.  We discussed the authority.  The only part I

10  saw was the source code that generated the identifier.  I

11  don't know if we are calling that part of the server or not.

12  I did not look at the parts that weren't related to -- now,

13  however, I did see the output of the server because that's

14  contained in the packet traces --

15  Q.  Okay.

16  A.  -- and that's available for anyone to inspect.

17  Q.  We'll get to that briefly.  Robert Young, in his

18  declaration at paragraph 5, talked about this problem between

19  human-readable code and non human-readable code, and I take it

20  you don't really have a disagreement with his assessment of

21  the problems in trying to deal with non human-readable code at

22  the back end of the defendants' --

23  A.  Do you mind if I read the statement?

24  Q.  No.  I am sorry, I thought you already reviewed the

25  declaration.

1  A.  I have reviewed it, but I would like to see it again.

2  Q.  Take your time.

3  A.  Yes.  This is absolutely factually true.  The computers

4  function on an object code.  Everything he says here is true.

5  Object code is created by taking human-readable source code.

6  This is the standard process by which programs are created.

7  So did you have a question other than --

8  Q.  No, I just wanted to know if you had any disagreement with

9  his assessment --

10  A.  Of how computer programs are generated --

11  Q.  And then he goes on to talk about --

12        THE COURT:  Just a minute.  You are talking over each

13  other.  Let's go by question and answer.  Go a little slower.

14        MR. FIEMAN:  Thank you, Your Honor.

15  A.  Can we start again?  Can you reask the question?

16  BY MR. FIEMAN:

17  Q.  Just to wrap this up, you also understand that I use the

18  word "reverse engineering" or trying to figure out what the

19  source code is from the binary code is a difficult or at times

20  impossible process?

21  A.  Generating the source code from a compiled program can be

22  difficult in some cases, not in others.  For instance, Java,

23  the compiled code, pretty much looks exactly like the source

24  code.  The script that I extracted from the binaries, which is

25  only part, was exactly human-readable.  But yes, absolutely,

1  it can be the case that compiled code can be obfuscated in

2  such a way that you can't reveal the source; however, that is

3  not what the statement in front of me is referring to.

4  Q.  Let me ask you this.  Let's say you've got a manual for a

5  foreign car, a BMW, and part of it is in English and the rest

6  is in German --

7  A.  Uh-huh.

8  Q.  -- and you can only read English?

9  A.  That's true.

10  Q.  Do you think you have a complete idea of how your car

11  operates or how to repair anything that may go wrong with it

12  if you can only read the English parts?

13  A.  Well, I still have the car, so I can drive the car and use

14  my experience to see -- my general experience to see how cars

15  operate and go with that.

16  Q.  Correct.  But --

17  A.  But yes, your question is would the manual tell me

18  everything?  Certainly.  I couldn't read the German parts.

19  That's true, I don't read German.

20  Q.  Now, I just want to talk a little bit -- and we are

21  getting close to the end -- about the delivery and routing of

22  the information on the internet in general and then more

23  narrowly within the Tor network --

24  A.  Okay.

25  Q.  -- and follow-up a little bit on the slides you presented

1  earlier.

2      This is from paragraph 8 of your declaration.  You made a

3  conclusion in paragraph 8 about the delivery and integrity of

4  the code, and you stated that "it stands without doubt that

5  the exploit and payload were delivered with integrity because

6  connections to Playpen were accepted only by a tamperproof

7  connection created and maintained by Tor," and you are

8  correct, nobody disputes that part.  Is that an accurate

9  summary of your statement?

10  A.  That is my statement.

11  Q.  Okay.  Now, you are aware, however, that not all of the

12  data involved in this case traveled or resided solely on the

13  Tor network, correct?

14  A.  For example, the results of the payload were returned

15  outside of Tor?

16  Q.  Yes.  They were returned on the open internet, correct?

17  A.  That's correct.

18  Q.  Now, this has also been provided to the Court.  I just

19  want to talk generally about the benefits of using encryption

20  or like the Tor network, an encrypted network, for

21  transmitting information.

22      Would you agree that there are benefits for sending

23  information through the internet on an encrypted connection?

24  A.  Yes.

25  Q.  Does that prevent tampering?

1  A.  It's one of the ways to prevent tampering; it's not the

2  only one.

3  Q.  But it is one fundamental way to use encryption, correct?

4  A.  Correct.  It's not the only one.

5  Q.  You are aware that the data that was collected from the

6  defendant's computer was not encrypted when it was sent from

7  the target computer to the FBI server, correct?

8  A.  My examination of the packet traces show that, you are

9  right, that the payload return packets through this TCP

10  connection, but it did not use encryption.

11  Q.  Is it fair to say that even such basic services or

12  companies like banks and credit card companies and things like

13  that generally use encryption as a security method?

14  A.  Yes.  Actually, could I restate the previous question?

15  Would you mind going back?

16  Q.  Maybe we should have it reread because I will probably --

17  A.  Forget?

18  Q.  -- forget what I was going to ask previously.

19  A.  You asked me if we could use encryption.

20  Q.  I am asking if the part of this delivery and return that

21  went from the target computers back to the government server

22  where the data was collected, the IP address, was that portion

23  of the transmission over the open internet?

24  A.  I'm sorry.  Yes.  I don't want to change anything.  That's

25  correct.  My apologies.  It was on the open internet.

1  Q.  Now, then you talk about these packet capture traces --

2  and I think it has got a little bit something -- and please

3  correct me if I am wrong, but I think it has something to do

4  with the data stream or the transmissions on the open

5  internet?

6  A.  Yes, that's exactly what that is.

7  Q.  You analogized your assessment of the security of that

8  part of the process based upon kind of "to" and "from"

9  addresses for the data, correct?

10 A.  Yes, uh-huh.

11 Q.  And I just want to give you a very simple analogy and see

12 if I understand this.  So it's a little bit like if I place an

13 order with Amazon for delivery of a pair of sneakers --

14 A.  Yep.

15 Q.  -- and they are put in a package by Amazon and the package

16 is delivered to my door, and we know the package got there

17 because it's being sent from Amazon, and we have a delivery

18 receipt to me, correct?

19 A.  Yes.

20 Q.  Does that basically coincide with what you were describing

21 in your declaration?

22 A.  Using your analogy, can I add one more detail?

23 Q.  Go ahead.

24 A.  So you said I ordered something from Amazon.  Sometime

25 later, it's delivered to my house.  And then Amazon knows that

1    it's been delivered and so on.  But part of that delivery

2    would be a tracking number.  Now, let's say I haven't received

3    my materials yet.  Amazon may say, why don't you track your

4    package?  So what do I do?  I go to the -- let's say Fed Ex

5    was delivering it.  I go to the Fed Ex website and they say

6    which package would you like to track?

7        Now, I can input everything in there, but I have to get a

8    very long tracking number to get the package that's going to

9    my house.  There's no encryption perhaps on that connection

10   but could my neighbor guess my package?  Not a chance.

11   Q.  But really, my question is a little bit different.

12   A.  Okay, but I think that's what --

13   Q.  That's a fair statement.  I think that's fair.  You got

14   the to and from information.  But, Professor Levine, do you

15   know what's in your Amazon package until you open it?  Do you

16   know if they sent you the sneakers or sneakers at all?

17   A.  No, I don't.

18   Q.  That brings me actually to the server component here, and

19   I just want to make sure -- confirm that you have not looked

20   -- setting aside the identifiers which you agree are at least

21   related but separate -- you have not looked at the server

22   component, correct?

23   A.  I have looked at the output of the server component, which

24   is in the packet traces.

25   Q.  Right.  Which is that address information, correct?

A.  Which is the complete packet trace including the address

information and the responses by TCP and so on.

Q.  Now, this is just my final question.

     BY MR. FIEMAN:  It's from, Your Honor, docket 31-2,

Mr. Tsyrklevich's declaration.

BY MR. FIEMAN:

Q.  I am just going to ask you about Vlad Tsyrklevich's

statement regarding the importance of the server component,

and this will be my last area --

A.  Okay.

Q.  Mr. Tsyrklevich states on page 3 of his declaration that

"it is the server component that stores the identifying

information returned by the payload, and it must faithfully

store and reproduce the data that was sent."

    Do you agree or disagree?

A.  I agree, but may I ask you, if you have a slide with that

statement, would you put it up?

     MR. FIEMAN:  Can we switch to the screen, Dara?  That

will make it much easier for everybody.

A.  If you wouldn't mind, could you repeat the question?

BY MR. FIEMAN:

Q.  It's actually the bottom paragraph we are focussing on.

The server component is what stores the identifying

information returned by the payload and "must faithfully store

and reproduce the data it was sent."  Do you agree or

1    disagree, in generalization?

2    A.  Yes.

3    Q.  Then he goes on to talk about some of the things related

4    to the server component that he was concerned about, including

5    the correct use of data storage -- I frankly don't even know

6    what that is.

7    A.  Well, for example, the checksum would be something that

8    would ensure that the data storage primitives were done

9    correctly.

10   Q.  That's an example?

11   A.  That's an example.

12   Q.  And the programming practices used on the component to

13   avoid corruption, tampering and things like that.  And then he

14   talked about this in terms of the digital chain of custody; is

15   that sort of a fair analogy?

16   A.  Is digital chain of custody an important concept in this

17   case?  Absolutely.

18   Q.  He concludes -- at least Mr. Tsyrklevich concludes -- that

19   without the missing data, basically the server component, "I

20   am unable to make a determination about the various chain of

21   custody issues."

22   A.  Well, I believe he -- are you asking me a question?

23   Q.  I am asking if you've read that and if you disagree or

24   agree with Mr. Tsyrklevich's assessment?

25   A.  I agree that chain of custody is an important part of

1    these cases.  I believe that this chain of custody is

2    available for review in the information that was provided, in

3    particular the information returned to the server is exactly

4    what is in the packet traces.

5        Additionally, as a redundancy, there's also the report

6    from the FBI about what was received.  Those values match, and

7    I have no reason to believe anything about the integrity of

8    what's in the packet traces.  So in fact, the chain of custody

9    is available for review, and I have done that and I believe it

10   was maintained.

11   Q.  But Mr. Tsyrklevich at least believes that the server

12   component is an important part of this chain of custody?

13   A.  And he does say that.  Unfortunately, we have both the

14   packet traces to see what the server received.  Effectively,

15   we don't even need the server.  We know what was received, and

16   we also have a report from the FBI of what they received.

17   They happen to match.  There's no reason to doubt, therefore,

18   that any chain of custody was broken, nor that the data was

19   tampered with along the way because the checksums would show

20   that kind of alteration by a router --

21   Q.  Okay.  So I fully understand this, you are satisfied with

22   the information that's been made available to you in terms of

23   the chain of custody --

24   A.  And I believe it meets his needs.

25   Q.  Well, Mr. Tsyrklevich at least is addressing here the fact

1  that the server component is an essential part of the chain of

2  custody process, correct?

3  A.  He's stating that, and I believe that's a failure on his

4  part to not take advantage of the packet traces that were made

5  available.  Perhaps if he had evaluated them, he would have

6  been able to conclude differently and this statement would

7  have been satisfied about his chain of custody.

8  Q.  But they were available to Mr. Tsyrklevich and he deemed

9  that would be insufficient without access to the server

10  component?

11  A.  How would he know without looking at them?

12  Q.  Because it's like saying you get half a puzzle in a box,

13  you are not going to know the picture unless you get the other

14  half.  Is that a fair way to put it?

15  A.  No.  And I can give you a counter example, if you'd like.

16  So for example, we don't know -- for a time, until the source

17  code was released for the identifiers, for generating the

18  identifiers, we didn't know exactly how they were identified.

19      But I gave the example of, without that code after the

20  fact, you could look for duplicates and validate that no

21  matter what algorithm was used, that process was completed

22  reliably.  So I believe here is another example where, even

23  though we don't have the server code, we do have the exact

24  information that was sent to the server.  There is also no

25  mysterious algorithm being performed at the server that is

1    under dispute.  There's no secret at the server --

2    Q.  How do you know that if you haven't looked at it?

3    A.  Because you don't need to know what happened at the server

4    other than the fact that the information was sent to it from

5    the packet traces.  We know what the server received.  We know

6    what the server generated.  We have the code for it.  I don't

7    see -- can you clarify for me what he would get out of looking

8    at the server code?

9    Q.  I am not the expert here.  I am just going by Mr.

10   Tsyrklevich's --

11   A.  I am sorry for interrupting.

12   Q.  He deals with the identifiers in the first bullet point,

13   correct?

14   A.  He does deal with it in his paragraph.  In my declaration,

15   I dispute what he says.

16   Q.  You dispute Mr. Tsyrklevich's assessment of the importance

17   of the server?

18   A.  No, that's not what I just said.  If you could put the

19   slide back on.  You asked me about the paragraph where he

20   talks about the --

21   Q.  Which paragraph?

22   A.  I believe you are talking about the bullet on what looks

23   like 15.

24   Q.  The first bullet or the last bullet?

25   A.  I believe you asked me about the first bullet, which is

13.  So I agree that he talks about unique identifiers in that
paragraph.  What I don't agree with is that this is a
cryptographic operation.  That's what I was starting to say.
It's factually not a cryptographic operation.

Q.  Again, you are sort of getting a little bit over my head.
Let me just ask one final question.  Mr. Tsyrklevich clearly
states -- and I understand you may not agree with him --

A.  I might.

Q.  -- that he needs to see the server component, and you say
he doesn't.  Is that a fair summary?

A.  I believe that the chain of custody can be validated based
on the information that the server received.  He may also like
to look at the server code, but it is a redundancy.  It's not
a necessity.

Q.  Well, he didn't say he'd like to do it, he says he's
unable to make a determination without it about the integrity
of the data.  Do you disagree with that statement?

A.  I believe he's correct, because he did not look at the
packet traces.  So his statement is correct in terms of what
he did and didn't do.

Q.  All right.

        MR. FIEMAN:  No further questions.  Thank you, Your
Honor.

        THE COURT:  Mr. Becker.

                        REDIRECT EXAMINATION

1  BY MR. BECKER:

2  Q.  Professor Levine, starting with the last topic of

3  questioning from cross-examination.  In the Tsyrklevich

4  declaration, did he point to any fact or evidence that

5  suggested that there was a problem with the digital chain of

6  custody that you've talked about?

7  A.  No, not to my knowledge, not to my recollection.

8  Q.  In terms of the security, you were asked some questions

9  about the TCP connection, its security and encryption.  In

10  terms of evaluating how secure that connection was, does that

11  evaluation have anything to do whatsoever with review of the

12  exploit and method of access?

13  A.  It has nothing to do with it, because it's a process

14  that's related to the payload and the execution of the

15  payload.

16  Q.  You were asked some questions about computer code being

17  human-readable or not human-readable.  Is code that is not

18  human-readable, testable?

19  A.  Absolutely, it's testable.  It's runable on a computer,

20  and you can even -- as an expert, you can even follow the code

21  and read it.  I myself, like many people who have computer

22  science degrees -- the second year of my undergraduate

23  program, I took a course on programming in "human-unreadable"

24  code.  So I have written an entire program, as probably any

25  computer science major with this type of code.  In fact, the

1  compilers that generate this other code were written by

2  humans.  There are people who do this.  It's testable.  It's

3  readable.  It's just not as easy as reading a book.

4  Q.  And so in the form that you reviewed the payload data, is

5  that in a form that could be tested in the sort of manner as

6  you suggested?

7  A.  It could be run again and again on a variety of computers,

8  as many times as they would like or any tester would like.  It

9  can be compared to the output of the packet -- it can be

10  compared to the packet traces specifically, is what I am

11  referring to and compared to contrast it.

12  Q.  Would you need to have the method by which that payload

13  information was delivered in order to conduct that sort of

14  testing?

15  A.  No, you don't.  As I said earlier, when someone breaks

16  into your house, that doesn't answer what they did when you

17  know what they did, it doesn't tell you how they gained entry.

18  Q.  Thank you.

19        MR. BECKER:  No further questions, Your Honor.

20        MR. FIEMAN:  Nothing further, Your Honor.  Thank you.

21        THE COURT:  Just a minute.  I have a question, and I

22  guess this is to counsel.  Mr. Levine or Dr. Levine --

23        THE WITNESS:  As you prefer.

24        THE COURT:  -- he indicated that the exploit and the

25  payload were two different things.  I've lost track of what

1   you all have because you've got some new information here.

2       Do you have information on the payload, as opposed to the

3   exploit, or are we just talking about the exploit?

4           MR. FIEMAN:  No.  We are talking about three things

5   at this point, Your Honor.  The exploit, which we disagree

6   about its functionality.  We have gotten readable parts of the

7   payload.  As you refer back to Mr. Tsyrklevich's declaration,

8   he received some information that actually started this whole

9   thing.

10          THE COURT:  You are telling me you don't have full

11  information that you want on the payload?

12          MR. FIEMAN:  Well, the problem is -- and we also

13  disagree about what's readable or not readable, and we are

14  actually just learning -- over the past week, I asked

15  Mr. Hampton about this just this past week -- that there are

16  not human -- there are human-unreadable portions of it, and we

17  are trying to clarify what that means and who's seen what.  I

18  honestly don't know at this point, except based on

19  Mr. Tsyrklevich's record he received some readable portions.

20          THE COURT:  Okay.

21          MR. FIEMAN:  So we are missing the exploit.  We will

22  go back and revisit -- I can sort out our terminology about

23  the payload, but regardless we are still, no matter what,

24  absolutely missing the exploit and the server components.  And

25  that has not changed since Michaud, Your Honor.

1     I hope that answers your question.

2          THE COURT:  Okay.  Thank you.  You may be excused.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Any further evidence to offer on the

5    first motion?

6          MR. BECKER:  Not from the government, Your Honor.

7          MR. FIEMAN:  No, thank you, Your Honor.

8          THE COURT:  All right.

9          MR. FIEMAN:  Your Honor, I would beg one caveat.  We

10   had represented in our pleadings that Mr. Young did in fact go

11   back and try to do this reverse engineering on Mr. Tippens's

12   hard drive.  We had represented in our pleadings that

13   Mr. Young had received a copy of Mr. Tippens's laptop hard

14   drive and did make the attempt to reverse engineer, as we are

15   calling it, and was unable to do that.  He is in court and can

16   confirm that if you need confirmation, but that statement in

17   my pleadings is saying that.

18          THE COURT:  I am mindful of the hour.  I assume the

19   next step is some argument on this motion, and I assume that

20   the sensible thing is to start that at 1:30.

21          MR. FIEMAN:  Your Honor, my only question is just in

22   terms of the national security presentation, where that would

23   fit into your schedule.

24     Assuming that the general representations are that the

25   exploit is classified and the information you received in

1    Michaud, we'd be prepared to go forward in our view.  It's

2    clear to me they are not turning over any information about

3    the VEP.  I don't know whether you need to make a finding

4    about any of that.

5            THE COURT:  I don't know what the order of things are

6    here.  Do we need to have that other hearing before we argue

7    this?

8            MR. BECKER:  Your Honor, as to -- you are speaking as

9    to the ex parte pleading?  The question is whether we need to

10   have the ex parte pleading presentation prior to the argument?

11           THE COURT:  Yes.

12           MR. BECKER:  I think, Your Honor, that certainly

13   relates to the motion to exclude.  I believe we could proceed

14   on the suppression and the dismissal without that

15   presentation.

16           THE COURT:  All right.  We are not going to have a

17   court reporter until 2:30 for that.  So let's reconvene at

18   1:30 and hear argument on the -- first on the motion to

19   dismiss, okay.  Then we'll come back on this.

20           MR. FIEMAN:  Did you want also want to hear argument

21   on the suppression issues which are also separate from the ex

22   parte pleading and the discovery issues?

23           THE COURT:  We are going to do these motions one at a

24   time, if that's what you are asking me.

25           MR. FIEMAN:  I just wanted to know if you wanted to

1   proceed directly to the suppression argument after that

2   initial argument.

3           THE COURT:  We are going to keep plowing until we are

4   done.

5           MR. FIEMAN:  Thank you.

6       (Luncheon recess.)

7           THE CLERK:  All rise.

8           THE COURT:  Please be seated.  Okay, the next matter

9   is the motion to dismiss.  I have read all of your submissions

10  on that subject, if I can get them out for reference.  I guess

11  the first order of business is argument from the defense.  So

12  you may proceed.

13          MR. FIEMAN:  Thank you, Your Honor.  I will be

14  relatively brief on this issue because I know it has been

15  thoroughly briefed.  There are just a few points that I want

16  to make here.  As I will show later, I think there is some

17  overlap with the other issues, because we are looking at

18  really, ultimately, with a lot of this, totality of the

19  circumstances and reasonableness standard.  And I understand

20  just how high the bar is legally in terms of dismissing the

21  indictment outright for outrageous conduct, but the

22  circumstances here are unprecedented and deeply troubling, and

23  there are some new facts that were not available to the Court

24  at the time of the Michaud hearing.

25      I do want to touch about that.  We have never, in our

 1   nation's history as far as I can tell, seen a warrant so

 2   utterly sweeping.  100,000 potential targets.  Something like

 3   8700 IP addresses captured.  At least 1152 open

 4   investigations.  And now oddly enough only, about 214 arrests.

 5   And I will be touching on that later.

 6        But what is truly remarkable on top of this is also, of

 7   course, the global aspect of it.  It is global not only in

 8   terms of the jurisdictional Rule 41 issues we are going to be

 9   talking about, but global in terms of what the FBI did in

10   terms of disseminating the child pornography.

11        And I want to be very clear, Your Honor, and that's why --

12   I found the *Sherman* case a little bit late, and I think it is

13   important because it captures what I have been trying to

14   articulate from the beginning.  We are not saying that it's

15   outrageous in any way, shape or form for the government to try

16   and investigate these type of cases on the Tor network.  What

17   was outrageous was the way they went about it.

18        When the *Sherman* court talked about and actually put the

19   government on notice about how it was inexplicable that they

20   would actively distribute, in that case a few videotapes and

21   pictures, in order to investigate their cases, well, it is

22   just vastly more inexplicable in this case and much more

23   disturbing given that prior warning from the Seventh Circuit.

24        Now, the government has not disputed at this point, I

25   think we are up to now about 62,000 pictures, videos, and

links to pictures and videos that were posted on Playpen.  And
that's just what's available given the amount of traffic to
the site just during the time that the FBI was in control of
the site.  We put out a conservative estimate of 1 million
images downloaded and circulated.  There's absolute silence in
terms of disputing that from the government, and as I said I
think that's a conservative estimate.

So let's just go step back to *Sherman*, and I have some
quotes available on the screen, just to show the starting
point.  In *Sherman*, all the way back in 2001, the Court
recognized --

THE COURT:  Just a second, I am looking for the
citation to *Sherman* here.

MR. FIEMAN:  I have it on the screen, Your Honor, 268
F.3d 539.  And we filed this in our reply to the government's
response to the motion to exclude.

THE COURT:  Okay.

MR. FIEMAN:  That was a case where the FBI, and I
think the postal service or customs had overlapping
investigations, and the FBI delivered a catalog of print
pictures and VCRs, and some of them actually containing child
pornography were sent to the target in the investigation.
Just to walk through a few points, and the Seventh Circuit
framed this as a warning to the government.  It was not raised
in the context of a motion to dismiss indictment.

1       The Court took it upon itself to make these statements,

2  because they were so troubled by it.  So first they start "we

3  are aware of the necessity of such tactics" -- in terms of

4  undercover operations and baiting with contraband -- "we are

5  aware of the necessity of such tactics in so-called victimless

6  crimes such as drug offenses, but the use of these methods

7  when victims are actually harmed" -- and they are talking

8  about the children depicted in these images -- "is

9  inexplicable."

10      And "moreover" -- this is again *Sherman*, continuing with

11 the quote from 549 -- "the government's dissemination of the

12 pornographic materials could hardly be described as a

13 'controlled' delivery."  Well, if it's not a controlled

14 delivery where they were able to send it to the defendant and

15 it sat in his house, I think for a period of time, several

16 weeks, and they recovered it ultimately, the scale of lack of

17 control and heedless distribution in this case is mind

18 boggling.

19      The Court went on in *Sherman*, "The government's

20 dissemination of child pornography during the investigation

21 resulted in an invasion of privacy of the children depicted.

22 The government here supplied *Sherman* with a literal catalog of

23 child pornography, and then delivered to him materials that

24 depicted actual children, allowing him enough time to view and

25 even copy the materials before arresting him."

1       And one of the things we've argued is that, and I don't

2   think it's seriously really disputed, is that particularly

3   with the Tor site, there are hosts of things they could have

4   done to maintain the credibility of the site and the traffic

5   to the site without actually distributing child pornography.

6       And Your Honor, we submitted last week, in response to the

7   latest discovery that were produced by the government, all the

8   things that were going on with the Tor site about how there

9   were problems with the file hosting, the very function that

10  allows you to upload or download.  It was slow.  Often people

11  couldn't access links.  In fact, we know from some of the

12  submissions that we put to the Court, this is actually fairly

13  commonplace with Tor sites because the very rerouting and

14  bouncing around from those that makes it anonymous also makes

15  it slow and often not very functional.

16      And all of those postings from the undercover agent, who

17  was posing as the administrator, indicate that they were

18  perfectly capable of saying file hosting is down, we are

19  rebooting, we are having access problems.  It didn't slow the

20  traffic at all.  They could have put out virtual child

21  pornography.  They could have put out child erotica.

22      What's even more disturbing, even if they disagree about

23  the efficacy of some of those methods, we now know from Agent

24  Alfin's recent testimony which we cited, there was absolutely

25  no discussion at the Department of Justice or the FBI about

 1    protocols in terms of handling this stuff or whether these

 2    methods of limiting, at least limiting the most egregious

 3    distribution were viable.  Nobody cared.

 4        This is in face of the warnings that they had from

 5    *Sherman*.  So again, it's not the fact that they took over a

 6    child pornography site.  It's not the fact they wanted to keep

 7    it up as a criminal undercover site.  It's the fact that they

 8    simply took no steps, and there's every indication they did

 9    not care, that as many as a million or more images were

10    flooding the internet, while they were in total control of the

11    site.  I am talking only the time period from the time the FBI

12    rebooted Playpen on its own server and the time they shut it

13    down on March 4th or March 5th.  The date is a little unclear.

14        So that leads me to *Sherman*, as they say on page 550, the

15    Court there said "we have no doubt that creative investigative

16    techniques and tight controls on the materials used as bait

17    for the consumers of child pornography can lead to better

18    protection of the victims of child pornography."

19        So there, again, they are focussing not on the overarching

20    goal, they are not discounting the difficulties in terms of

21    investigating the type of crime, what they are saying is if

22    you do this, you need to do it extremely carefully and take

23    every possible step to limit the distribution and

24    revictimization.

25        And we have seen now, we have been asking for information,

1   getting information for really almost a year now, Your Honor,

2   starting with Michaud, and what we know now is there was no

3   discussion of trying to limit the distribution.  There were no

4   protocols for these agents for handling or limiting the

5   distribution of child pornography.  And the scale of the

6   distribution now went out to at least 120 countries, at least

7   1 million images.  And it is absolutely mind boggling, we have

8   not seen something like this.

9       So Your Honor, I started out early on in the *Michaud* case

10  saying I was appalled by this, because with my limited

11  familiarity about the methods and techniques and technology

12  available, I was aware, and certainly my experts, there are

13  lots of ways to go about this when you are not, as the world's

14  largest distributor of child pornography for at least a

15  two-week period, heedlessly and discriminately pumping out and

16  revictimizing children with this type of material.

17      And Your Honor, I made this analogy before, but what they

18  are doing here is really, I think, fairly simple.  Every one

19  of these defendants that I have seen charged in these cases,

20  and I haven't seen all 214, but there's a lot of information

21  that comes my way about other cases, but in every single case

22  that I have seen the person charged is your run of the mill

23  heartland person going to look at some of this stuff,

24  downloading some of it.  I don't think -- well certainly these

25  clients have not been charged with distribution, but the

 1   amount of images that are at stake in these cases from the

 2   individual clients, and they run in the hundreds, maybe a few

 3   thousand, but they are essentially the addicts and couriers

 4   who are going to the drug house and the kingpin for this

 5   stuff.  Whatever justifications the FBI had for stepping into

 6   the kingpin role, they should have been darn sure that they

 7   weren't distributing pure heroin indiscriminately to the

 8   entire world when they were trying to do this.  To me that's

 9   effectively what happened here.

10       So Your Honor, I will return to some of these points I

11   think in terms of the probable cause and other issues, but

12   that is essentially our argument.  It is not that they took it

13   upon themselves to investigate these crimes, I recognize and I

14   appreciate the difficulties of doing this.

15       You know, apart from being a defense attorney I am a

16   parent.  But as a parent I would want to know that law

17   enforcement, as they are going about with the end in sight of

18   trying to investigate the addicts and the couriers, that they

19   do not themselves step into the role of such a distributor.

20       Thank you, Your Honor.

21           THE COURT:  Let me ask you a couple questions, and

22   the government may want to comment on some of this.  If a

23   user, a Tor user signed into this website and saw child

24   pornography, could that person then download those pictures

25   into his own computer?

1          MR. FIEMAN:  Yes.

2          THE COURT:  Could those pictures then be transferred

3    to others?

4          MR. FIEMAN:  Absolutely, that is routinely what would

5    happen, Your Honor.  So let me just follow-up on that point.

6       One of the very troubling things here, as you know from

7    the NIT warrant, the authorization allowed the FBI to deploy

8    the NIT and complete their searches in a matter of a fraction

9    of a second, at the time the targets landed on the home page.

10   So they had authorization to collect all the information they

11   wanted before anybody actually got the content, and then had

12   the opportunity through this improved file hosting feature the

13   FBI was running, to not only to download, post new images.  We

14   know new material, at least 43 series was posted during the

15   time the FBI was running this site, and of course massively

16   redistributed from whatever computers and users had access to

17   it.  So that's another aspect of this.

18         THE COURT:  I am not sure I understand that.  You

19   mean additional pornography was attached to this site?

20         MR. FIEMAN:  Yes.

21         THE COURT:  By users?

22         MR. FIEMAN:  Yes, Your Honor.  The government's

23   disclosure, we submitted their letter, that in addition to all

24   the redistribution, as a result of the FBI maintaining this

25   site, at least 43 new series, new victims were posted --

1          THE COURT:  By Series, you mean --

2          MR. FIEMAN:  For example, you might have 15 or 20 or

3    100 pictures in a series, or you might have a series of

4    videos, there might be two or three, there might be dozens.

5    And I don't know the exact quantity, because all we know from

6    the disclosure is 43 new series.  But during just that window

7    of time that the FBI was running this site, 43 new series.

8    That means things that haven't been seen from the National

9    Center for Missing & Exploited Children were launched onto,

10   uploaded with the assistance of the FBI through their file

11   hosting feature, onto the site, and have now circulated

12   globally and will never be recovered.

13       And those images are, as you know from the old series we

14   see, they are redistributed endlessly.  So the circulation for

15   at least 43 new victims was actively aided and abetted by the

16   FBI.

17       I have never seen anything like that before, Your Honor.

18   Just to get back to my original point, they didn't have to do

19   that.  All the NITs could be deployed from the home page.

20   We'll talk about what that home page showed, the fact that a

21   lot of people could have gone in, said oh my God, this is a

22   child pornography site, and backed out.  There's a whole

23   separate series of problems there.  But the way they asked for

24   the authorization actually made it completely unnecessary to

25   act -- to distribute any of this stuff.

1      I can even understand if they saying okay, we are going to

2  narrow this warrant so we are only going to deploy the NIT

3  when people go to specific subdirectories that have a

4  particular kind of content on it, and then once those

5  subdirectories look realistic so will deploy from there, but

6  that's not what they asked.  They asked for deployment from

7  the home page.

8      It was unnecessary and was it heedless, and it was

9  massive.

10      Thank you, Your Honor.

11          THE COURT:  Okay, thank you.  Mr. Hampton.

12          MR. HAMPTON:  Thank you, Your Honor.  Again, I want

13  to address two important points that we just concluded on.  It

14  is true that over the life of Playpen, not during the two

15  weeks it was under FBI control, but over the life, the FBI and

16  the images and videos they were able to catalog being

17  trafficked in the site, those images contained 42 series.  So

18  over that six-month period that had not been seen by anyone,

19  that's true.  But that didn't just happen during that two

20  weeks.  But that certainly in the end that means there are 42

21  new series.

22      Now, we don't know whether that necessarily means new

23  victims or new images and videos that haven't been seen

24  before.  All we know is that NCMEC hadn't seen them.

25          THE COURT:  Just a second, if somebody added

1   something onto this site, doesn't the FBI have it after the

2   site is closed to public access?  Can you show me this website

3   now?  I don't want to see it, but is it somewhere?

4           MR. HAMPTON:  Your Honor, we do -- there is an off

5   line copy of the website, yes.

6       The government in its warrant did ask to deploy the NIT at

7   log-in.  However, it also made very clear that it may in its

8   discretion choose to deploy it more strategically.  That is,

9   deploy it to those who accessed the most egregious content.

10      So I just want to make clear that the government actually

11  flagged that on the front end that would be a possibility.

12  And in fact that is generally how they approached the

13  operation.

14      But I think what's important about the defense position,

15  and what they have acknowledged is something, I think, the

16  government on some level doesn't dispute, that these are very

17  tough choices.  We are dealing with criminals who are acting

18  with practical impunity, using the anonymity that Tor provides

19  to traffic in the most appalling images and videos that one

20  can think of.

21      So the law enforcement interests are very strong.  But we

22  also have to acknowledge that when the FBI identified this

23  website, identified the opportunity to take it over and to

24  identify -- and then to identify its users through the use of

25  technology, the FBI, the Department of Justice, had to make a

very tough call.  Does the potential benefits of identifying

those users who are committing horrific crimes with

essentially impunity, outweigh the known consequences that

that website will continue to be used by those users to trade

child pornography?

   And the government undertook that balancing before the

process was initiated, while Playpen was under FBI control.

There were regular meetings.  We have discussed those in our

pleadings.  The FBI asked for a total of 30 days.  Ultimately

the government concluded to terminate the operation in two

weeks.

   So the government knew well how tough this choice was.

But the legal standard, which I think is what the Court must

focus on in evaluating defendants' motion here, is not did the

government make a tough choice?  Could someone disagree with

how the government balanced these interests?  The question is

did the government act in a way that is so outrageous as to

offend fundamental notions of due process and fairness?

   Nothing about what the government did was fundamentally

unfair to these defendants.  These defendants learned about

Playpen.  They gained access to Tor.  They chose to log-in to

Playpen and to access it.  And they chose to have the

collections of child pornography stored on their devices that

we found in their homes.  The government did not create

Playpen.  It did not force the defendants to join Playpen or

1   to download pornography from anywhere.  That was the

2   defendant's choice.

3       And the Ninth Circuit, in applying this outrageous test,

4   the way it determines whether or not the government acted in a

5   way that was so fundamentally unfair, balances these important

6   factors.  What was the government's involvement in the crime?

7   The government's involvement was minimal.  The government

8   allowed a website that was already in operation to continue to

9   run.

10      The Ninth Circuit looks to what was the defendant's role

11  in the crime?  The defendant's role in the crime was

12  substantial.  They are the ones who committed these crimes,

13  not at the urging or behest, not in communicating with the

14  government, but of their own free will.

15      The Ninth Circuit also looks at the necessity of the

16  technique.  And the government explained in detail in its

17  search warrant application and affidavit why this was an

18  appropriate investigative approach.  It disclosed that

19  information to the magistrate judge who authorized the

20  warrant, to the district judge who authorized the Title III.

21  And then the government did its very best to minimize the

22  harm.

23      It monitored the traffic on the site.  If it identified

24  individuals that it believed were actively abusing children,

25  it took the steps necessary to try to rescue them.  And indeed

1    some children were rescued and have been rescued since.

2         And for defense counsel to characterize all the defendants

3    as sort of mere addicts who just accessed a few images, that's

4    not true.  There have been cases of producers who were

5    identified.  There have been the cases of the individuals who

6    administered this website, who were setting up a system to

7    efficiently transfer huge quantities of child pornography over

8    the internet anonymously.

9         These are bad people who hurt children.  And the

10   government did what it thought was necessary and appropriate,

11   given the technological limitations it faced, to try to

12   identify those people and bring them to justice.

13        Now, I think it is absolutely fair to say that reasonable

14   people can disagree whether this was the right balancing,

15   whether this is an investigation, an investigative technique

16   that should be used, whether at this point or should it be

17   used in the future.  I think that's appropriate.  We can have

18   a discussion about that.

19        But the question is not can someone disagree with what the

20   government did?  Can someone conceive of some better way for

21   the government to do it?  The question that the government

22   asked so outrageously, that the unfairness of what the

23   government did offends the due process clause and shocks the

24   conscience.  And I don't think it can be fairly said that what

25   the government did here was so grossly unfair to the rights of

1   the defendants, or to anyone as to shock the conscience and to

2   offend fundamental notions of fairness in due process, and I

3   would urge the Court to deny the motion.

4         THE COURT:  What about the statute?  18 U.S.C.

5   3509(m) that says you have to keep such material in the care,

6   custody and control of the government?

7         MR. HAMPTON:  That's correct, Your Honor, and that's

8   true.  But it is well understood that sometimes law

9   enforcement has to do things that would, if not done by law

10  enforcement, be contrary to the law, and so it was a necessary

11  part of this investigation.  It is illegal to deal narcotics.

12  The government, however, sometimes in the course of undercover

13  investigations has to allow illegal narcotics to be

14  trafficked.  It's the same unfortunate necessity.

15        THE COURT:  There's not the same kind of a statute

16  preventing, arguably preventing what happened here with drugs,

17  is there?  That's a different deal.  This is a pretty specific

18  statute, you haven't mentioned in your briefing, and I am

19  wondering where it comes in here.

20     Usually when there's a warrant issued, there's a lawyer

21  somewhere in the background, and I wonder about the ethical

22  propriety of putting this material out to the public in spite

23  of that statute.  And I don't know who's making these

24  decisions, but it seems to me it's of concern, both ethically

25  and legally.

1          MR. HAMPTON:  Well, Your Honor, I certainly agree

2    it's a difficult problem.  It is not an easy choice for anyone

3    to take on this particular approach, but I think that the way

4    law enforcement works, and has worked from the beginning, has

5    to allow law enforcement the leeway to investigate crimes.

6    That statute certainly -- the statute says what it says.  But

7    by necessity, law enforcement has to sometimes do things that

8    if done by someone else might run afoul of the law.

9          THE COURT:  Isn't that basically saying to Congress,

10   I don't care what you think, we are going to do what we think

11   we need to do, to do our jobs.

12         MR. HAMPTON:  Well, Your Honor, I think -- I see how

13   one might read it that way.  I don't think that is, though,

14   what -- I don't want to seem flip in responding to statutes,

15   but I think the same argument could be made when the

16   government permits illegal narcotics to be trafficked.

17   Because you are right, while there's not a statute like 3509,

18   it's still illegal for anyone, other than law enforcement, to

19   possess illegal drugs, to possess with intent to distribute,

20   to distribute them.  There is that same problem, the

21   government's investigative necessity to prosecute, sometimes

22   to prosecute those crimes, it has to do things that private

23   parties are not allowed to do.

24         THE COURT:  Was this statute even considered by

25   anyone before all this occurred?  I don't think we know,

 1  unless Mr. Becker may know.

 2          MR. HAMPTON:  Your Honor, Mr. Becker has pointed

 3  something out to me, which I apologize should have mentioned

 4  at least as to 3509.  3509(m) applies to the discovery

 5  context, so it's about discovery in criminal proceedings, so

 6  it is narrowly drawn.  As to the considerations, without

 7  implicating -- it doesn't apply.

 8          THE COURT:  Well, the title of the section is Child

 9  Victims' and Child Witnesses' Rights, and it has more to do

10  than discovery.  But anyway, that's --

11          MR. HAMPTON:  I am referring specifically to

12  subsection (m), which is the section of the statute that

13  relates to the explicit material, the material involved in

14  this case.

15          THE COURT:  Okay.

16          MR. HAMPTON:  One thing I think I should clarify, to

17  make sure that the Court understands what the government is

18  saying here, the government did not at any point create or

19  manufacture child pornography or itself post child

20  pornography.  The people who posted and distributed child

21  pornography on Playpen are the users of Playpen.  The people

22  who were doing it for months while Playpen was under

23  investigation, and prior to its coming under government

24  control, are the exact same, maybe not identical as there may

25  have been changes in the users, but it's the same set of users

 1  who continued to do that after.

 2      The government simply did not stop Playpen from operating

 3  immediately.  It allowed it to operate for a brief period so

 4  that it could identify those people who were actively sexually

 5  exploiting children.

 6          THE COURT:  Well, he's going to say you all were

 7  doing exactly what the people you just arrested there in

 8  charge of the website were doing.  So, you know, go ahead with

 9  your argument, counsel.

10          MR. HAMPTON:  I understand that is the defense

11  position, but I think it's an important distinction here.

12          THE COURT:  I don't know who wears the white hat,

13  Mr. Hampton.

14          MR. FIEMAN:  Your Honor, just very briefly.

15      You know, Your Honor, this is the problem with the whole

16  case.  First of all, they never disclosed, they never told

17  Magistrate Judge Buchanan that they were going to be operating

18  a child pornography site and redistributing child pornography

19  in the course of this investigation.  They never disclosed

20  that on the warrant, and I assure you she never would have

21  signed off on it.

22      They now say that reasonable minds can differ about what

23  Congress has essentially already decided; this is illegal and

24  you have to maintain custody and control.  Again, you know,

25  when they don't like the rules, they don't like Rule 41, they

don't like the Magistrate's Act, they violate their own
policies on hacking into foreign countries.  Telling, on one
hand, the rules committee that we understand Rule 41 does not
allow foreign searches, while the whole time they know this is
an international search.

They disagree with 3509.  They disagree with the statute
that you are not supposed to distribute child pornography at
all.  There was a time we could not even get the mirror image
hard copies of our client's hard drives to prepare for trial
under the protective orders because they are saying, no, if we
hand that to you, we are distributors of child pornography in
the context of defending a case pursuant to a protective
order.  Now they turnaround and tell the Court, well, we
didn't post it.  Yes, they did post it, because without those
file hosting features, none of this could have been done.  And
if nothing else they kept those up and they improved on it in
terms of speed and accessibility.

So reasonable minds can differ except where the law says
otherwise, where Congress has said otherwise, where the rules
said otherwise.  Those decisions have been made.

And we know also, Your Honor, that this warrant was signed
off on by an AUSA in Virginia.  We don't know what debate was
going on except from October 11th, Agent Alfin's testimony
that this was debated by high levels in the FBI and DOJ.  And
yet they elected, either the FBI on its own, and we've

 1   certainly seen the FBI willing to go out on a limb by itself
 2   regardless of the advice of DOJ on a number of occasions or
 3   whether nobody simply cared.

 4        And this is really the crux of it.  The ends are okay.
 5   The means were deplorable.  It's reassuring that they did not
 6   produce child pornography.  If that's what we're reduced to,
 7   that's great.

 8        But the problem here, Your Honor, is that while trying to
 9   solve one problem and avoid revictimization of some children,
10   they created a massive new one.  And we have seen no
11   protocols, no explanation for why they did it this way.

12        Every one of those people who's been arrested was arrested
13   based on IP information that was collected at the point that
14   they landed onto the home page.  Everything after that was
15   completely unnecessary.

16        Your Honor, to the extent that reasonable minds can differ
17   about this, and I don't think they can, particularly given the
18   warning, the explicit warning that was in the *Sherman* case,
19   and the fact that this was never disclosed to Magistrate Judge
20   Buchanan in terms of how this investigation was going to be
21   done, I am asking the Court to make a referral to the
22   Department of Justice and the FBI, Offices of Inspector
23   General.

24        To whatever extent that there are reasonable differences
25   that can be elucidated, to whatever extent the attorneys

involved in this and the Department of Justice and in Virginia
and the FBI did not take proper precautions in the handling or
distribution of child pornography may have violated their bar
oaths, I think all this needs to be sorted out, not just based
on the limited information that we have, but internally as
well.

If they don't want to disclose their deliberations, and
the Court has already ruled on that, we respect that ruling
although we object to it, then let them do it in-house.  Let's
have the IG offices do that in an appropriate manner and make
recommendations about this.

But at this point we only know what happened in the end,
it was not disclosed to the magistrate, at least a million
images out there, and absolutely no investigatory need to do
this.

Thank you, Your Honor.

THE COURT:  Thank you.  Now, are you prepared for
this other hearing at this point, Mr. Becker?

MR. BECKER:  For the ex parte matter, Your Honor?

THE COURT:  Yes.

MR. BECKER:  Yes, Your Honor, we have the documents
available.

THE COURT:  Okay, I see our court reporter in the
back, too.  Why don't you all get set up and we'll do that
next and then come back to court --

 1          MR. BECKER:  Very well, Your Honor.

 2          THE COURT:  -- and finish the rest of this.

 3      Let Dara know when we are ready.  Just give me a minute, I

 4  want to read the motion and the reply again before we start.

 5  Okay.

 6          MR. BECKER:  Very well, Your Honor.

 7          THE COURT:  You all ready?

 8          MR. BECKER:  Yes.

 9          THE COURT:  Okay, well give me a couple minutes to

10  read this.

11          MR. BECKER:  Thank you, Your Honor.

12          THE COURT:  Again.

13      (Recess taken.)

14          THE COURT:  Okay, I will give you a short ruling

15  after I take ten minutes or so.  We'll reconvene about 3:15.

16      (Recess taken.)

17          THE CLERK:  All rise, Court is again in session.

18          THE COURT:  Please be seated.  Okay, first I should

19  give you a ruling on the ex parte and in-camera hearing that

20  we just completed.  The real subject was three areas of

21  discovery that the plaintiffs have made.  It is my judgment

22  that the discovery need not be disclosed by the government

23  based on what I learned and heard at the in-camera ex parte

24  hearing.

25      Other issues remain, as do whether that material is

1  relevant and helpful and material to plaintiffs and whether a

2  summary can or should be substituted.  I don't reach those

3  issues.

4       Now, the remaining matter today is the third motion, which

5  is the motion to suppress.  I know it's Halloween and I know

6  some of you probably can't wait to go trick or treating.  I am

7  good for the day, but I don't know what issues you have.  I

8  want to give you plenty of time to argue this last motion

9  which has a lot of parts to it.  But you tell me when you want

10 to stop.

11          MR. FIEMAN:  Well, Your Honor, if I may approach.

12 First of all, just to clarify where we are in terms of

13 discovery issues.  If I understand, the Court has determined

14 that, as it did in Michaud, that the government need not turn

15 over the components.  We would still like to argue, however,

16 which is essentially the same on Michaud, the sanctions that

17 should imposed for nondisclosure.  I don't know if you want to

18 hear argument on that, I was a little unclear, because we

19 believe we are in the same position that we were in the prior

20 case.

21      We do have argument about -- it's the same situation that

22 we talked about from *Jencks* and everything.  The government

23 clearly has classified information, and they have a right not

24 to hold it --

25          THE COURT:  Wait, I want to give you time to argue

 1   whatever it is you want to argue.  The question before the

 2   house is how long you want to argue this afternoon?

 3           MR. FIEMAN:  Well, I know that Mr. Hamoudi's son is

 4   hoping he'll be home around 5:00 to go trick or treating.  I

 5   may have about 45 minutes or an hour of argument.

 6       My request, and I think it's joined, is that we reconvene

 7   tomorrow morning for the remaining issues.  We've done all the

 8   evidence.  It shouldn't take much -- it will take the morning,

 9   at most.

10           THE COURT:  You are telling me you don't think we'll

11   be finished tonight anyway?

12           MR. FIEMAN:  No, Your Honor, not with both arguments,

13   and I know counsel have points they want to make apart from my

14   general arguments.

15           THE COURT:  Mr. Becker, you are hiding behind that

16   machine.  I don't know if you are making nasty faces at me or

17   what.

18           MR. BECKER:  Definitely not, Your Honor.

19           MR. HAMPTON:  Your Honor, we'll defer to the Court.

20   We are happy to come back tomorrow morning and finish things

21   up, that's fine.

22           THE COURT:  Well, that's fine with me, I guess.  It

23   doesn't matter to me a lot one way or the other.  I hate to

24   lose an hour, but I have got tomorrow entirely clear.

25       I intended to start out this morning by telling you that I

 1   have made a bad mistake in this case in authorizing

 2   over-length briefs.  I read all your briefs, most of it twice,

 3   on these three motions.  And they all could have been done

 4   within the time limits very nicely and they would have been

 5   better briefs.  I guess what I am leading up to is I feel the

 6   same about argument here.  Try and keep it succinct and to the

 7   point and bear in mind I have read your briefs.

 8            MR. FIEMAN:  I will use the evening to edit my notes,

 9   Your Honor.

10            THE COURT:  That would be good.

11       Okay, well, we'll reconvene tomorrow at 9:30, then, and

12   finish the argument in this case.  And happy Halloween.

13       (The Court recessed to Tuesday, November 1, 2016, at the

14   hour of 9:30 a.m.)

15                    *    *    *    *    *

16                   C E R T I F I C A T E

17

18       I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20

21   /S/  Teri Hendrix                  November 21, 2016

22   Teri Hendrix, Court Reporter            Date

23

24

25